Gary S. Lincenberg - State Bar No. 123058
  glincenberg@birdmarella.com
Thomas V. Reichert - State Bar No. 171299
  treichert@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant
Todd Michael Ficeto

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| UNITED STATES OF AMERICA, | CASE NO. 2:13-CR-00183 VAP |
|---|---|
| Plaintiff, | **Todd Ficeto's Sentencing Memorandum** |
| vs. | Sentencing Date: March 23, 2020 |
| FLORIAN WILHELM JURGEN HOMM, TODD MICHAEL FICETO, COLIN HEATHERINGTON, and CRAIG HEATHERINGTON, | Time:            TBD<br>Crtrm.:          8A |
| Defendants. | |

3628688.3

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ...........................................................i

TABLE OF AUTHORITIES ......................................................ii

A.   Section 3553 Factors Strongly Support A Downward Variance. ........... 1

    1.   Nature And Circumstances Of The Offense................................ 4

    2.   The Government's Sentencing Recommendation Would Result In Disparately Harsher Treatment Of Mr. Ficeto Than The Other Participants In This Case. ............... 10

    3.   Just Punishment. ..................................................... 16

    4.   Deterrence. ........................................................... 17

    5.   Protection of the Public. ............................................. 18

B.   The Loss And Gain Attributable To The Alleged Fraud Cannot Be Reliably Determined........................................ 19

    1.   The alleged loss is not reasonably calculable............................ 23

    2.   The alleged gain is also impossible to calculate with reasonable certainty. ................................................. 31

C.   Considering All These Factors, The Court Should Impose A Sentence Of Probation. .......................................... 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ...............................................................................23, 24

*Gall v. United States*,
    552 U.S. 38 (2007) ....................................................................................... 1

*Kimbrough v. United States*,
    552 U.S. 85 (2007) ....................................................................................... 1

*Koon v. United States*,
    518 U.S. 81 (1996) ....................................................................................... 4

*Morrison v. National Australia Bank*,
    561 U.S. 247 (2010) ..................................................................................... 7

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)........................................... 3, 16, 18

*United States v. Ameline*,
    409 F.3d 1073 (9th Cir. 2005) (*en banc*)................................................. 20

*United States v. Berger*,
    587 F.3d 1038 (9th Cir. 2009) ........................................................... 19, 31

*United States v. Booker*,
    543 U.S. 220 (2005) ..................................................................................... 1

*United States v. Carmona-Rodriguez*,
    No. 04 CR 667 (RWS), 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) ................ 19

*United States v. Crandall*,
    525 F. 3d 907 (9th Cir. 2008) ................................................................... 33

*United States v. Doe*,
    705 F.3d 1134 (9th Cir. 2013) .................................................................. 20

*United States v. Ewing*,
    16-cr-00317 (C.D. Cal.)............................................................................ 11

*United States v. Ferguson*,
   584 F. Supp. 2d 447 (D. Conn. 2008) .......................................................... 20, 31

*United States v. Gonzalez*,
   492 F.3d 1031 (9th Cir. 2007) ................................................................................ 21

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................................ *passim*

*United States v. Gushlak*,
   No. 03-CR-833 NGG, 2011 WL 782295 (E.D.N.Y. Feb. 24, 2011) .................. 23

*United States v. Hall*,
   610 F.3d 727 (D.C. Cir. 2010) ................................................................................ 20

*United States v. Hance*,
   501 F.3d 900 (8th Cir. 2007) ................................................................ 20, 31, 32

*United States v. Hartstein*,
   500 F.3d 790 (8th Cir. 2007) ................................................................................ 23

*United States v. Heine*,
   No. 3:15-CR-238-SI, 2018 WL 2986212 (D. Or. June 14, 2018) ...................... 22

*United States v. Hilgers*,
   560 F.3d 944 (9th Cir. 2009) ................................................................................ 20

*United States v. Hussain*,
   No. CR 16-00462 CRB (N.D. Cal.) ..................................................................... 16

*United States v. Johnson*,
   No. 16-CR- 457 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27,
   2018) ........................................................................................................ 15, 17, 18

*United States v. Jordan*,
   256 F.3d 922 (9th Cir. 2001) (O'Scannlain, J., concurring) ............................... 21

*United States v. Laurienti*,
   611 F.3d 530 (9th Cir. 2010) ................................................................................ 30

*United States v. Markert*,
   774 F.3d 922 (8th Cir. 2014) ................................................................................ 23

*United States v. Medina*,
   485 F.3d 1291 (11th Cir. 2007) ........................................................................ 20, 32

*United States v. Pollock*,
No. 3:14-CR-00186-BR, 2016 WL 1718192 (D. Or. Apr. 29, 2016)..................22

*United States v. Reyes*,
No. 3:06-cr-00556-CRB, Dkt. 737 (N.D. Cal. Nov. 27, 2007)............................23

*United States v. Robles*,
No. CR 04-1594 B SVW, 2015 WL 1383756 (C.D. Cal. Mar. 19,
2015)..........................................................................................................22

*United States v. Rosacker*,
314 F.3d 422 (9th Cir. 2002) ...................................................................32

*United States v. Rutkoske*,
506 F.3d 170 (2d Cir. 2007) ..............................................................20, 32

*United States v. Showalter*,
569 F.3d 1150 (9th Cir. 2009) ...........................................................21, 31

*United States v. Smith*,
951 F.2d 1164 (10th Cir. 1991) ...............................................................33

*United States v. Staten*,
466 F.3d 708 (9th Cir. 2006) ............................................................21, 22

*United States v. Treadwell*,
593 F.3d 990 (9th Cir. 2010) ........................................................*passim*

*United States v. Whitehead*,
532 F.3d 991 (9th Cir. 2008) ....................................................................1

*United States v. Wilson*,
No. 4:14-cr-00304-JD, Dkt. 50 (N.D. Cal. Feb. 5, 2016) ...................22

*United States v. Zolp*,
479 F.3d 715 (9th Cir. 2007) ...............................................20, 21, 29, 32

**Federal Statutes**

18 U.S.C. § 3553................................................................................1, 33

18 U.S.C. § 3553(a)(2)(A) ........................................................................16

18 U.S.C. § 3553(a)(2)(C) ........................................................................18

18 U.S.C. § 3553(a)(6) ................................................................................ 10

Fed. R. Crim. P. 32(i)(3)(B) ...................................................................... 20

Sentencing Reform Act .................................................................................. 3

Sentencing Reform Act, 18 U.S.C. § 3553(a) ................................. 1, 3, 4, 16

U.S.S.G. § 2B1.1(b)(1) ......................................................................... 19, 33

U.S.S.G. § 2B1.1(b)(1) cmt. n.3(C) ........................................................... 20

U.S.S.G. § 2B1.1 cmt. n.3(B) .................................................................... 31

U.S.S.G. § 2B1.1 cmt. n.3(C)(v) ............................................................... 23

U.S.S.G. § 2B1.1 cmt. n.3(F)(ix) ......................................................... 24, 25

**Other Authorities**

Richard S. Frase, *Punishment Purposes*, 58 STAN. L. REV. 67, 80
        (2005) ................................................................................................ 18

Defendant Todd Ficeto submits this Sentencing Memorandum in advance of his sentencing on March 23, 2020.  Because we understand that an amended PSR will be filed shortly, we have refrained in this memorandum from addressing the specific Sentencing Guidelines items that will be addressed therein, other than to address legal issues relating to loss and gain.

The Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Kimbrough v. United States,* 552 U.S. 85 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), rendered the Guidelines advisory, in favor of courts considering the Guideline factors in connection with the factors set forth in the Sentencing Reform Act ("SRA"), 18 U.S.C. § 3553(a). *See Booker*, 543 U.S. at 244-46.  In doing so, the Supreme Court "breathe[d] life into the authority of district court judges to engage in individualized sentencing." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (*quoting United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (en banc)).  The individualized assessment that this invites is particularly important in this case, because there is an enormous variance between a blind application of the Sentencing Guidelines calculation matrix and the actual human being who is Todd Ficeto.

## A.    Section 3553 Factors Strongly Support A Downward Variance.

"[O]n this day of judgment, must not one judge the man as a whole?" *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).  Todd Ficeto is more than what is depicted in the pages of a PSR, or in cherry-picked exhibits and testimony. He is a human being; a man of strengths and weaknesses.  Those who really know him say that he is kind, generous, optimistic and decent.  He is a family man of boundless optimism; when he became unable to secure employment because of the fallout from the Absolute Capital implosion, he went back to school to complete his college degree, and then went on to obtain a master's degree.  He has taken on the role of stay-at-home dad, taking care of his adopted daughter while his wife continued her job as an elementary school teacher.  He is a man who has

1  honored his obligations to his parents, his children, and to this Court.  As Judge

2  Rakoff reflected in the *Gupta* sentencing:

> Imposing a sentence on a fellow human being is a formidable
> responsibility. It requires a court to consider, with great care and
> sensitivity, a large complex of facts and factors. The notion that this
> complicated analysis, and moral responsibility, can be reduced to the
> mechanical adding-up of a small set of numbers artificially assigned to
> a few arbitrarily-selected variables wars with common sense.

*Gupta*, 904 F. Supp. 2d at 350 (Rakoff, J.).

Indeed, while this case has focused on the few years of his dealings with

Absolute Capital, it has now been almost thirteen years – three times as long – since

Florian Homm abruptly ended the charged conspiracy at Absolute.  When Homm

disappeared, Mr. Ficeto stayed, assisted new management in trying to address the

fall-out, and remained in place to address and defend against the consequences of

what transpired.  The personal stress and challenge of these past thirteen years on

Todd Ficeto is impossible to convey fully in words.  But over the course of it, he has

acted uprightly and honorably throughout.

Mr. Ficeto's life has been largely on hold for these years, during which time

he has defended himself from civil and criminal lawsuits, had his marriage end in

divorce, had virtually all of his assets forfeited, including his home, been

unemployable in his field, suffered the agony of a federal prosecution pursued with

the enormous power and resources the Department of Justice, and the humiliation of

a public trial and conviction.  Virtually everything has been stripped from him.

Now, determining his sentence lies with this Court.  The government has agreed to

recommend a sentence of not more than 8 years.  We respectfully submit that this is

disproportionately harsh given the circumstances of this case, the length of time that

has passed, the punishment (or lack of punishment) of others who played a far larger

role in the offense conduct, and the fact that warning flags attendant to these cross-

trades were more yellow than red in the earlier years of the scheme.  As the

Government has conceded, these warning flags grew over time. Yet the Guidelines

1    assign a loss amount that punishes Mr. Ficeto for Homm's entire scheme.

2        Much has been written about the difficulty of applying the Sentencing Reform

3    Act fairly to cases involving high dollar figures.[1]  Originally, it was hoped that the

4    Guidelines would "moderate unwarranted disparities … by enacting a set of

5    complicated rules that" would lead to "a sentence approximately equal to what

6    empirical data showed was the average sentence previously imposed by federal

7    judges for that crime." *Gupta*, 904 F. Supp. 2d at 350.  In practice, the fraud

8    Guidelines have had the opposite effect because the Sentencing Commission

9    focused almost entirely on one factor: "the amount of monetary loss or gain

10   occasioned by the offense.  By making a Guidelines sentence turn, for all practical

11   purposes, on this single factor, the Sentencing Commission effectively ignored the

12   statutory requirement that federal sentencing take many factors into account, *see* 18

13   U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences

14   would be irrational on their face."  *Id.* at 351.

15       Here, as in other white-collar cases, we expect the Guidelines calculation will

16   be driven disproportionately by the Court's factual determination of "loss" or, where

17   it cannot be assessed, of "gain".  Although we await the final PSR, it seems almost

18   certain that the loss figure will increase the sentence by many *multiples*.  In cases

19   like this—cases with profound escalations from the base figure—it is particularly

20   important for the Court to "focus[] more on the statutory factors set forth" in Section

21   3553(a).  *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y.

22

23   ------------------------------------------

23   [1]   *See, e.g.*, *Gupta*, 904 F. Supp. 2d at 351 ("Take the hypothetical but typical case

23   described by Professor Kate Stith of Yale Law School, involving a typical securities

24   fraud defendant who pled guilty to inflating the financial figures of a public

25   company, thereby causing at least 250 shareholders to collectively suffer a reduction

25   of more than $12.5 million in the value of their shares. In 1987, such a defendant

26   would have faced a Guidelines sentence of 30–37 months; but by 2003, the same

27   defendant would have faced a Guidelines sentence of 151–188 months, a more than

27   500% increase.").

28

1   2006).  Indeed, the Guidelines "*must*" take a backseat to Section 3553(a), which

2   specifically "requires a court to take account of a defendant's character in imposing

3   sentence." *Gupta*, 904 F. Supp. 2d at 354 (emphasis added).

4        Here, there are a number of factors that warrant a departure from the

5   Sentencing Guidelines and support a more lenient sentence.

6        **1.     Nature And Circumstances Of The Offense**

7        The Guidelines are meant to advise courts on sentencing for only a

8   "heartland" of cases, the "set of typical cases embodying the conduct that each

9   guideline describes."  *Koon v. United States*, 518 U.S. 81, 93 (1996).  When the

10  Court is faced with an atypical case—when the conduct and offense fall outside that

11  "heartland"—it can and should consider an appropriate departure from the

12  Guidelines.  *Id.*  This is precisely that atypical case.[2]

13       The facts of this case are unusual in that Mr. Ficeto is being prosecuted in

14  connection with his role in an alleged $200 million fraud, yet he never had any

15  involvement with Absolute's investors, its misrepresentations to its investors,

16  compliance program, or dealings with its market regulators and accountants.

17  Absolute managed a series of European hedge funds that primarily solicited

18  European investors; Mr. Ficeto was a broker in Los Angeles, California who

19  provided financial services on their U.S. investments.

---

[2]   Throughout this sentencing memorandum, there are several areas where, as
counsel for Mr. Ficeto, we describe our view of the evidence.  Some of this was
evidence presented in Court.  The Court heard this evidence and formed its own
impressions.  We do not ask the Court to accept everything we say; nor do we
contest  the verdict.  But we do ask the Court to consider the history of this case in
light of its sentencing obligations.  So for example, even if Mr. Ficeto ignored
certain yellow or red flags, even if he failed to make as exhaustive disclosures as he
might have, what do the nature of his actions and the overall circumstances say
about the appropriate punishment?  We suggest that if the Court consider these
circumstances from Mr. Ficeto's perspective, the Court will conclude that they
support mitigation from the harsh punishment recommended by the government.

1    Late in the 1990s, Mr. Ficeto met Florian Homm in connection with a

2    business transaction.  Homm ended up buying a 50% interest in Mr. Ficeto's

3    business in the United States, Hunter World Markets.  Homm was a passive

4    investor.  Mr. Ficeto complied with the disclosure requirements under FINRA (at

5    the time, the NASD) by disclosing this investment. After they suffered investment

6    losses, some of the sophisticated investors later complained that they did not know

7    of Homm's investment in Hunter.  But the information was available through the

8    FINRA-prescribed method for disclosure and was always visible through the

9    FINRA BrokerCheck website.  (Exh. 2258-010.)  While Mr. Ficeto had no control

10   over what Mr. Homm disclosed, he made certain that he and Hunter World Markets

11   complied with U.S. regulatory requirements.

12        That was true throughout.  Mr. Ficeto made good faith efforts to comply with

13   the law. Aside from the evidence presented to the jury of culpability in the Absolute

14   scheme, there are many examples of this.  It would paint a wholly inaccurate picture

15   to not include them when weighing his sentence.  Thus, for the Hunter Fund, Mr.

16   Ficeto made sure it filed the necessary SEC disclosure statements for its securities

17   holdings, *see, e.g.*, Exh. 2263.  And while he could not control their decision, he

18   advised the Absolute Capital hedge funds to do so as well.  (Exhs. 2757, 2478.)  In

19   connection with the stock offerings for the penny stock companies, he used

20   respected lawyers at K&L Gates and Troy & Gould, who testified at trial and made

21   plain that they did not believe that there was anything improper in how these stock

22   offerings were handled by Mr. Ficeto.

23        After Florian Homm disappeared and Todd Ficeto was sued by someone he

24   had never met, he went to respected Los Angeles counsel for estate planning advice.

25   Counsel suggested he set  up a Cook Island trust account, which he did.  Mr. Ficeto

26   again followed all U.S. laws in doing so and filed annual disclosures with the IRS.

27   (Exh. 2270.)  This Court is well aware of the legion of tax cases in the last ten years

28   involving tens of thousands of individuals who did not report overseas accounts in

order to evade taxes.  They were so common that the IRS offered a generous voluntary disclosure program to ease the enormous caseload.  Otherwise respectable banks, accounting firms and financial advisors paid billions in fines for their roles in helping account holders shield their assets and income.  Yet despite how common this was, Mr. Ficeto made all of the proper filings.

After the SEC opened its Homm investigation, Mr. Ficeto hired former SEC attorneys at Pillsbury to represent him. Through those lawyers, he disclosed both the trust account and Tony Ahn's IMs to the government.  (Exhs.651, 656.)[3]

And while Florian Homm, Sean Ewing, Colin Heatherington and Craig Heatherington were seeking to evade U.S. authorities abroad, Todd Ficeto made a conscious decision to address his legal issues through the court system.  Despite the enormous financial, emotional, and family toll it took on him, he never wavered from this commitment.  Even with respect to business commitments back in 2007, when Florian Homm fled to South America, Todd Ficeto tried to help his client.  He spent 2008 trying to assist the new management at Absolute Capital make sense of their investments and how they wanted to proceed.  With lawsuits and investigations, by 2009, Mr. Ficeto's business Hunter World Markets was effectively out of business. The page after page of Google results linking him to Absolute Capital left him unable to gain meaningful employment.  Year after year of these repercussions punished him both emotionally and financially.  For the past twelve years, Mr. Ficeto's life has involved family, school, and litigation.  The strain tore his prior  marriage apart.  (His ex-wife Christina is submitting a letter in support of Mr. Ficeto to the Court.)  Unable to obtain a job, Mr. Ficeto returned to school in Ohio and completed his undergraduate degree.  He earned a Master's

---

[3]   Current counsel can further represent that, over the course of eleven years of representing him, without reservation, Mr. Ficeto was at all times open with his records pertaining to litigation.

degree in clinical pharmacology.  During this time, he met and fell in love with his current wife, Melody.  Even with his graduate degree, he has been unable to obtain employment.  Instead, Mr. Ficeto has become the primary caregiver for his adopted daughter, Grace, while  Melody works as an elementary school teacher to support the family.

Since 2008, Mr. Ficeto's life of litigation has included this criminal case, a parallel forfeiture case, an SEC case, a parallel federal civil case in New York, and a California state civil case in Los Angeles.  The California civil case was a suit brought by Absolute investor Jack Grynberg.  Grynberg was an individual whose whole life involved investing in high-risk ventures, including overseas ventures in which he was not permitted to invest.  Mr. Ficeto had never met or spoken to Mr. Grynberg, but Mr. Grynberg still sued him for fraud.  The jury found Mr. Ficeto not liable, and the state Court of Appeal affirmed.  The verdict is helpful in connection with this sentencing because it was a good example of an investor claiming he was defrauded by Absolute and suing Mr. Ficeto even though he never had any dealings with Mr. Ficeto whatsoever.  That is true of every Absolute investor.  Despite winning at trial, the trial and appeal went on for years and exhausted Mr. Ficeto.

The Grynberg case shed light on the nature of the investors in Absolute.  First, most were sophisticated, high risk investors.  They reviewed offering memoranda and knew that their investments were risky.  These were hedge funds employing high-risk, high-reward strategies.

The Southern District of New York civil securities fraud lawsuit was filed by the Absolute hedge funds themselves.  Judge Daniels dismissed the suit on the grounds that the fraud allegations all involved overseas hedge funds with foreign investors and were subject to the rule against extraterritorial application of the federal securities laws enunciated in *Morrison v. National Australia Bank,* 561 U.S. 247, 130 S. Ct. 2869, 177 L.Ed.2d 535 (2010).  The Second Circuit reversed the dismissal holding that the allegations made out a sufficient nexus to the United

7

States to give the district court jurisdiction.  Judge Daniels' decision brought to light the real issue of whether this case even belongs in a U.S. courtroom, thereby demonstrating another unusual aspect of this case: the fraud primarily took place between managers of a foreign hedge fund and foreign investors.

In the midst of this, in 2013 the United States Attorney went public in this matter with an indictment of Florian Homm (which did not name Mr. Ficeto as a defendant).  This is another recognition that the central allegations here were on the fraud taking place at Absolute.

Meanwhile, the government filed civil forfeiture proceedings to go after assets of Mr. Ficeto that were derived from Mr. Homm's scheme. The government eventually seized Mr. Ficeto's home here in Los Angeles, land that he owned in Utah, and all of the funds in his Cook Islands bank account. Mr. Ficeto settled these matters, agreeing to return nearly $7 million and relinquishing all of his interest in this property to the government.

The forfeiture cases demonstrated Mr. Ficeto's good faith. Mr. Ficeto had reasonable defenses and the forfeitures would take a tremendous toll on him. Not even in the worst case scenario was all of his money derived from Homm.  But Mr. Ficeto recognized that, regardless of whether or not he had legitimately earned (and paid taxes on) this money, if the money was connected to misrepresentations by Absolute, then the government's claim of forfeiture was made in good faith.

An SEC action was filed here in Los Angeles and later in stayed in favor of the criminal prosecution (as was the hedge funds' SDNY civil case).

As the government pursued extradition efforts against Homm, the years passed. Mr. Homm left Absolute in September 2007; eight years later, in December 2015, the government added Mr. Ficeto as a defendant.  A reasonable bond was set. Recognizing that Mr. Ficeto had remained to defend himself and acted in good faith over the intervening years, Mr. Ficeto was given the freedom to travel, including overseas travel, on an unsecured appearance bond.  [Dkt. 52.]

1    Meanwhile, the parties continued their negotiations to settle the criminal case.
2    The government took reasonable positions, settlement negotiations proceeded in
3    good faith up to the eve of trial, but the parties were unable to reach final agreement.
4    Mr. Ficeto may pay a hefty price now for choosing to go to trial rather than
5    settling, but ultimately he wanted his day in court.  He always disclosed the fact that
6    Hunter was executing cross trades and felt that he relied in good faith on his
7    compliance officer to let him know if that was a problem. He did not make the
8    investment decisions for Absolute.  And he did not partake in Absolute's
9    misrepresentations to its investors.  At trial, Mr. Ficeto testified in good faith to the
10   best of his ability.  He recognizes that, like other witnesses in this trial, his memory
11   may be colored by personal interests.  Sixteen years ago, he had a desire to benefit
12   from the lucrative relationship with Absolute that he was offered.  In litigation, he
13   wanted to defend his actions.  Human beings recall things in a way that tends to
14   confirm their biases.  This was not only true of Mr. Ficeto; it was also true of Mr.
15   Ahn, Ms. Pagliarini, and others. He accepts that the jury decided in favor of the
16   government.
17   In the time since the verdict, in July 2019, Mr. Ficeto has spent time with his
18   wife and their daughter in South Carolina, with his ex-wife and their children in
19   Ohio, and preparing for this sentencing.  He has worked cooperatively with Pretrial
20   Services and provided all the information they have asked for.  This case has been
21   Todd Ficeto's daily life for more than a decade.  When Florian Homm fled Absolute
22   Capital, Todd Ficeto was 41; today, he is 53. Whatever happens next, this
23   prosecution has already consumed a large piece of his adult life.
24   Mr. Ficeto respects the jury's verdict.  In doing so, he is expressing the same
25   willingness to live within the legal system that he has shown from that first point
26   when he made sure that Homm's investment in Hunter World Markets was properly
27   disclosed.  Throughout this long, and truly overwhelming, process, he has conducted
28   himself honorably, and his sentence should take this into account.

**2.      The Government's Sentencing Recommendation Would Result In Disparately Harsher Treatment Of Mr. Ficeto Than The Other Participants In This Case.**

Section 3553(a)(6) provides that in determining the sentence to be imposed, a court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In this matter, there are glaring disparities in how the government has handled different co-conspirators. If the Court considers the relative roles of Sean Ewing, Florian Homm, Colin Heatherington, Craig Heatherington, Tony Ahn and Elizabeth Pagliarini, and attempts to sentence Mr. Ficeto proportionate to his relative conduct, the appropriate sentence is probation.

**Sean Ewing**. Sean Ewing was the co-founder, Chairman, and CEO of Absolute Capital. At trial, the government called Darius Parsi as a witness. Parsi testified that in the spring of 2005, he sent an pseudonymous email to various third parties (including the British equivalent of the SEC) disclosing Homm's artificial inflation of stock prices in order to inflate hedge fund performance, and that Sean Ewing became aware of this and discovered that he had been the sender. According to Parsi, in May 2006, Ewing spoke with Parsi and threatened him; because of his fear that Ewing would physically harm him, Parsi recanted his allegations.

That same month, Ewing reported on this matter to the Absolute Capital board. (Exh. 2484.) According to the minutes of that meeting, prepared by another witness, Glenn Kennedy:

> Sean Ewing explained to the Board of Directors that the Company was made aware of an anonymous letter which was circulated by a former employee alleging misconduct in the management of the Company's funds. This letter was, however, subsequently retracted, and after an internal investigation, no evidence of misconduct has been uncovered.

(Exh. 2484 at 7.) But virtually everything Ewing said was false. He knew the

identity of the letter writer – Darius Parsi, **a former director** of Absolute Capital, the very Board to which he was reporting this information.  He knew that the letter was only retracted because he threatened Parsi.  And he knew that there was no such internal investigation.  Because all of this happened just as Absolute Capital was going public, and Ewing was about to make a lot of money, he intentionally covered up the whistleblower's revelation.  Indeed, Kennedy testified that one board member requested a copy of Parsi's letter, and that Ewing never provided it.

Sean Ewing, the Chairman and CEO, was fully aware by May 2006 of the fraud that Homm was directing to prop up the value of various hedge funds as the company was going public, and he covered it up.[4]  Subsequently, in July 2007, Mr. Ewing resigned as CEO in order to "spend time with his family."  Mr. Parsi concluded that Mr. Ewing resigned from his management position in order to sell his Absolute Capital shares without triggering the disclosure requirements that would apply if he remained an officer of the company.  Ewing was the CEO of the company, he knew about and covered up the wrongdoing, and then he cashed out before it became public.  He ultimately fled to Dubai.

In 2016, the government entered into a deferred prosecution agreement with Mr. Ewing.  *United States v. Ewing*, 16-cr-00317 (C.D. Cal.).  Under that agreement [Dkt. 17], although the government knew from Mr. Parsi of Mr. Ewing's knowledge of the scheme and his role in covering it up at Absolute Capital in 2006, Mr. Ewing received a deferred prosecution agreement.  Despite a net worth estimated to be in the neighborhood of $100 million, much of it gained from Absolute, he was required

---

[4]   Mr. Kennedy hardly comes out smelling clean from this, either.  Having been made aware of this alleged misconduct, he knew that Ewing refused to give the letter to a Board member, and he knew that no investigation was conducted, contrary to what Ewing told the Board.  Mr. Kennedy, the company counsel, was present and did nothing; to the contrary, he has led the hedge funds' pursuit of various other people for the past decade.

to pay $8 million.  His deferred prosecution was for just one year.  As the CEO of Absolute, Ewing had direct insight into and power over Absolute's representations to investors, accountants and the market.  Yet the ultimate insider paid a tiny fraction of his ill-gotten gains, never suffered a criminal conviction, and never spent a day in jail.

**Florian Homm**.  Florian Homm was the Chief Investment Officer of Absolute Capital.  He was the architect and chief executor of the fraud scheme in question.  In connection with the trading of penny the penny stocks, both Craig Heatherington and Darius Parsi testified that Homm dictated the performance goals that the hedge funds had to meet that Colin Heatherington then turned into trade orders for Tony Ahn to execute.

Homm was arrested in Italy in March 2013 and the United States began extradition efforts.  Homm resisted unsuccessfully, but nevertheless managed to secure release from an Italian jail in June 2014.  He reportedly walked to a train station and took a train to his native Germany, where he remains a free man not subject to extradition.  He has never been convicted; indeed, the parallel matter against him in Switzerland was recently rejected by the tribunal and remanded to the prosecutors for further investigation.

**Tony Ahn**.  The government's case centered on the "secret IMs" between Colin Heatherington and Tony Ahn and the trades that Tony Ahn placed . The government introduced exhibit after exhibit reflecting trades that were ordered by Colin Heatherington and placed by Tony Ahn.  All the buying, all the selling, all the cross trades, cancelled trades, and so-called wash trades were executed by Mr. Ahn. The IMs between Tony Ahn and Colin Heatherington were replete with instances where Tony Ahn was proposing the strategy to meet Colin's price goals. (See, e.g., Trial Exhibit 5 at 8, 12 and 105(9/20/06, 9/27/06, 5/15/07). Tony Ahn was the trader who took his direction from Colin Heatherington via IM and placed all the trades that form the basis of Todd Ficeto's conviction.  And as Mr. Ahn testified at trial, he

1   intentionally deleted all of the Windows instant messages.  While the SEC was

2   conducting its investigation of Hunter World Markets in May 2008, Mr. Ahn went

3   into the office before resigning and used a computer program, CCleaner, to clean up

4   his computer.

5        He testified at trial that he did not believe that he did anything wrong:

6        Q:  [W]hen you were buying stock to get to a certain price or when you

7        put in a cross trade at the request of your customer, you didn't think you

8        were doing anything illegal, did you?

9        A. No.

10       Q. Now, you didn't intend to cheat anyone, did you?

11       A. No.

12       Q. You didn't intend to defraud anyone, did you?

13       A. No.

14  [Dkt. 261 at 18:13-19.]  Tony Ahn, the trader, was the primary witness with

15  personal knowledge who testified against Todd Ficeto, telling the jury that Todd

16  Ficeto was aware of everything that Tony Ahn was doing.  Despite the clear

17  evidence that Mr. Ahn was the instrument through which all of the trading occurred,

18  the government completely declined to prosecute Tony Ahn.

19       **Elizabeth Pagliarini**.  According to the government's FINRA and SEC

20  investigators and experts, the nature and volume of the penny stock trades raised red

21  flags for a compliance officer.  Ms. Pagliarini was the Compliance Officer for

22  Hunter World Markets.  She reviewed and signed off on every single trade that

23  forms the basis of Todd Ficeto's securities violations, and almost every wire that

24  forms the basis of Todd Ficeto's money laundering violations.  The government

25  declined to prosecute Ms. Pagliarini.  Even though Mr. Ficeto owned Hunter, made

26  more money, and allegedly did not disclose every detail of the trades, the gross

27  disparity in Mr. Ficeto receiving a lengthy prison sentence while Ms. Pagliarini

28  walks free cannot be reasonably reconciled.  As the compliance officer hired

because Mr. Ficeto had been placed under heightened supervision, she was the one with the duty, and training, not to approve those trades and to counsel Mr. Ficeto that they were not permissible.  While the government elicited testimony that Ms. Pagliarini was not aware of the cavalier language in the Ahn/Heatherington IMs, to try to distance her from the alleged criminal wrongdoing, the government's expert investigators and witnesses testified that the trades *on their face* were highly suspect and raised red flags.  The disparity between the punishment for Mr. Ficeto and Ms. Pagliarini can only be so gross.

**Craig Heatherington**.  Craig Heatherington worked at Absolute Capital in Spain.  According to his testimony, he worked with Colin Heatherington in tracking and recording the trading activity, and was involved in altering the trading records to mask the personal trades by his brother and others.  He admitted to daily participation in the scheme.  He hid from authorities for years, and only agreed to come to the United States to testify when offered his complete freedom through the deferred prosecution agreement, with no payment of any fine at all.

**Colin Heatherington**.  While Tony Ahn was executing the orders, Colin Heatherington was placing them.  According to Craig's testimony, Florian Homm would dictate to Colin Heatherington what performance figures he needed, Colin would figure out what that translated to in pricing, and Colin would then dictate the prices to Tony Ahn.  As the government showed repeatedly at trial, Colin would send instant messages to Tony setting out the closing prices he wanted Tony to obtain and would direct trading activity; this included directing trading activity for the Hunter Fund. (See, e.g., Exh. 0005 at 38, 127.)

Colin Heatherington resides in Canada and has spent the past dozen years avoiding civil suits and resisting extradition.

Homm and Ewing were much larger players who directed misrepresentations to investors, which they concealed from Ficeto.  They also profited far more than Mr. Ficeto.  Yet one was given a DPA and the other is avoiding conviction by

1   avoiding extradition.  Colin Heatherington, who could also be viewed as a more
2   central player given his daily work at Absolute and his role in calculating the prices
3   and placing the trades, has a fate that is still uncertain, but we do know that he failed
4   to appear voluntarily, unlike Mr. Ficeto.  Even if he is viewed as lesser player
5   because he profited less, Mr. Ahn had a direct, active role and was the trader making
6   all the trades and concealing evidence; he was given a complete pass by the U.S.
7   Attorney's Office.  And Ms. Pagliarini was the person responsible for ensuring
8   compliance, having been hired because Mr. Ficeto was subject to heightened
9   scrutiny situation, yet she approved every trade.  Though each of the government's
10  multiple regulator witnesses made clear that, on a daily basis, she approved trades
11  that should not have been approved, the U.S. Attorney's Office gave her a complete
12  pass.

13          Only Todd Ficeto faced an indictment and answered to a forfeiture complaint
14  in a U.S. courtroom.  He worked cooperatively with the government to settle the
15  forfeiture matter, in the process giving up virtually all of his assets.  He appeared in
16  the criminal case and defended himself in good faith.  The Court should consider
17  these facts in making its sentencing decision.

18          Outside of this case, there are a wide range of cases with higher and lower
19  sentences that attorneys can direct the Court to look to.  From the defense
20  perspective, we offer a few comparisons simply to highlight that large investment
21  loss figures should not distort the need for individualized sentencing in these cases.
22  In *Gupta*, for example, Judge Rakoff determined that the defendant's total offense
23  level was 28 points (including 18 points for a gain figure of $5 million); he was
24  sentenced to 24 months' imprisonment, which he served at a minimum-security
25  camp. *Gupta,* 904 F. Supp. 2d at 353. In *Johnson*, foreign national Mark Johnson
26  had a total offense level of 29; he, too, was sentenced to a prison term of 24 months
27  and a fine of $300,000. *Johnson*, 2018 WL 1997975 at *3, 6.  In *Adelson*, Impath's
28  ex-COO, Richard Adelson, was convicted of securities fraud that was in the

heartland: Impath lied to its shareholders about its huge losses, ultimately causing a stock drop of 88% and "a combined loss" to Impath's "thousands of shareholders … of no less than $260 million." *Adelson*, 441 F. Supp. 2d at, 509. Adelson's total offense level—which included enhancements for "more than 250 victims" and obstruction of justice—was 46 points, which called for a sentence of life imprisonment. *Id.* at 510. In the end, Adelson served less than three years in prison. In *United States v. Hussain*, No. CR 16-00462 CRB (N.D. Cal.), Judge Breyer sentenced Shushovan Hussain, the CFO who was convicted in a case involving an alleged $5 billion loss arising from Hewlett-Packard's acquisition of Autonomy, to 5 years in prison notwithstanding the government's request for a twelve year sentence.

The Sentencing Guideline loss tables don't capture cases outside of the run of the mill. This is just such a case. And the Guidelines really fail to account for cases, such as this one, where knowledge grows over time. Throughout the years, the government has always recognized that evidence of Mr. Ficeto's knowledge of wrongdoing grew over time; it was far less clear that he understood Homm's overall scheme in 2004-06 than it was by 2007. This also supports greater leniency in the Court's sentencing determination.

### 3.    Just Punishment.

Section 3553(a) instructs courts to consider "the need for the sentence … to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). In deciding on a sentence that is sufficient but no greater than necessary the Court should consider the extent to which Todd Ficeto has already suffered as a result of the indictment, trial, and verdict.

As noted above, this case and the related litigation has consumed Mr. Ficeto's life for the past 12+ years. Florian Homm left Absolute Capital in September 2007. Since then, Todd Ficeto has been unemployable. If you Google his name, page after page of results are about nothing other than Absolute Capital, his indictment, his conviction, the suit by the SEC, and the suit by the hedge funds. Even after

completing his Bachelor's degree, obtaining a Master's degree and relocating to South Carolina, he has been unable to secure employment.  Instead, he has dealt with a constant stream civil and criminal litigation.  In the process, his marriage fell apart and he lost his home and virtually all of his remaining assets.  And then, eight years later, after the statute of limitations would have expired in the ordinary case, the sword of Damocles finally fell and he was indicted.  By then, he had lost pretty much everything.  With the trial and verdict, he now comes to the Court as a convicted felon.  The last thing he has is his liberty, which now lies in the Court's hands.

The mere fact of the indictment and the jury's verdict have been deeply embarrassing for Mr. Ficeto, and have imposed on him (and his family and friends) a real and public humiliation.[5]  He will certainly never again be able to work in the securities industry.  Financially, he has already forfeited virtually all of his assets.  Psychologically, the strain of this matter, extended over more than twelve years, has been immeasurable; it was certainly too much for his first marriage, and has put an immense strain on his second marriage.  The experience of the past twelve years has itself been a significant punishment.

### 4.    Deterrence.

This Court must weigh the potential deterrent effect of any sentence—both specifically, as to Todd Ficeto, and generally, as to the public at large. *See United States v. Johnson*, No. 16-CR- 457 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("General deterrence is the effect a sentence has on the public's likelihood to engage in the type of activities that led to the defendant's conviction; specific deterrence is the effect a sentence has on the defendant's propensity to commit

---

[5]   For example, after Mr. Ficeto had returned to college in Ohio, a 6th-grade schoolmate told Mr. Ficeto's son, Hunter, that his father was not away at school, but was in jail, instead.

1    further crimes of this nature.").

2        First, there is zero risk that Todd Ficeto will make the same mistake again. As

3    a practical matter, he will never again be in a position to do so: his securities

4    licenses have lapsed, and his ability ever to regain them will be lost once this Court

5    enters a conviction against him.  His reputation is ruined; in short order, he will

6    become a convicted felon. *Cf. Gupta*, 904 F. Supp. 2d at 355 ("As to specific

7    deterrence, it seems obvious that, having suffered such a blow to his reputation, [the

8    defendant] is unlikely to repeat his transgressions, and no further punishment is

9    needed to achieve this result.").  Even more significantly, Todd Ficeto is deeply

10   aware of the heartache and upheaval this case has wreaked not just on him, but on

11   his family – his ex-wife, his current wife, his parents, his brother, and his children.

12   Having to explain to his teen-aged children that he has been charged, and now

13   convicted, of a crime has been one of the most difficult and humiliating experiences

14   of his life.

15       Second, as courts around the country have repeatedly recognized, "there is a

16   considerable evidence that even relatively short sentences can have a strong

17   deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at

18   514 (collecting sources). Such offenders have "much to lose from being convicted,

19   regardless of the penalty." Richard S. Frase, *Punishment Purposes*, 58 STAN. L.

20   REV. 67, 80 (2005). Indeed, "most business executives fear even a modest prison

21   term to a degree that more hardened types might not." *Gupta*, 904 F. Supp. 2d at 355

22   (imposing a 24-month sentence where the advisory guidelines range was 78 to 97

23   months). *Johnson*, 2018 WL 1997975, at *5 ("[L]et me be clear: any amount of

24   prison time is a serious amount of prison time. In addition, the court will impose a

25   substantial fine.").

26       **5.    Protection of the Public.**

27       In determining the sentence to be imposed, the Court must consider the need

28   to "protect the public from further crimes of the defendant." 18 U.S.C.

§ 3553(a)(2)(C).  Todd Ficeto is not a criminal from whom the public needs protection. He is a 53-year-old *first-time* offender who has suffered shame and major upheaval as a result of his trial and conviction—factors that weigh in favor of a lower sentence. *See, e.g.*, *United States v. Carmona-Rodriguez*, No. 04 CR 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (imposing sentence below Guidelines range in part because defendant was a 55-year-old first-time offender).

Furthermore, as noted above, while he has not worked in the securities industry since 2009, Todd Ficeto will never be able to work in the securities industry again after judgment is entered.  Nor does he have any interest in doing so. Since Hunter World Markets ceased operation, he went back to school, completed his Bachelor's degree, and received a Master's degree in clinical pharmacology; to the extent he can obtain employment, would like to help conduct clinical trials.

Considering all of these factors, this is a case where the facts are highly unusual, and make this an appropriate case for a significant downward variance from the normal Guidelines range.

**B.     The Loss And Gain Attributable To The Alleged Fraud Cannot Be Reliably Determined.**

For cases that have securities fraud at their core, the concept in the Sentencing Guidelines is that there is a base number for the offense, with adjustments based on the amount of loss or, if the amount of loss cannot be adequately determined, the amount of gain.  Section 2B1.1(b)(1) of the Sentencing Guidelines sets a base offense level (7) and then imposes an enhancement based on the overall amount of loss resulting from the offense that is causally attributable to the defendant's criminal conduct. *See* U.S.S.G. § 2B1.1(b)(1); *United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir. 2010). To apply the enhancement, the government must prove the existence of a loss, the loss amount, and the causal nexus between the loss and the defendant's offense conduct. *Treadwell*, 593 F.3d at 1000; *United States v.*

*Berger*, 587 F.3d 1038, 1047–49 (9th Cir. 2009).

Where, as here, the loss amount is disputed, the Court cannot apply the enhancement without expressly determining the loss amount. *See* Fed. R. Crim. P. 32(i)(3)(B); *United States v. Doe*, 705 F.3d 1134, 1155 (9th Cir. 2013) ("[A]ll Rule 32 findings must be express or explicit." (internal quotation marks omitted)); *United States v. Ameline*, 409 F.3d 1073, 1085–86 (9th Cir. 2005) (*en banc*) ("[W]hen a defendant raises objections to the PSR, the district court is obligated to resolve the factual dispute, and the government bears the burden of proof . . . The court may not simply rely on the factual statements in the PSR."). Moreover, the court cannot assign a loss figure without findings; it must develop some evidence to support the loss amount. *See*, *e.g.*, *United States v. Hall*, 610 F.3d 727, 745 (D.C. Cir. 2010) (remanding for resentencing where the district court provided no reason for finding loss in excess of one million dollars).

When calculating the loss, the amount need not be determined with "absolute precision." *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007); *see also* U.S.S.G. § 2B1.1(b)(1) cmt. n.3(C) ("The court need only make a reasonable estimate of the loss."). However, the government still must: (a) "use a rational calculation method" "grounded in sound economic principles," *United States v. Hance*, 501 F.3d 900, 909 (8th Cir. 2007); *United States v. Ferguson*, 584 F. Supp. 2d 447, 451 (D. Conn. 2008); (b) rest its estimate on "reliable and specific evidence," *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007); (c) exclude "[l]osses from causes other than the fraud," *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007); and (d) show by a preponderance of the evidence that its narrow loss estimate is "reliable," *Hance*, 501 F.3d at 909; *Treadwell*, 593 F.3d at 1000. Speculative estimates of the loss amount are forbidden. *Medina*, 485 F.3d at 1304 ("[C]ourts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines."); *United States v. Hilgers*, 560 F.3d 944, 947 (9th Cir. 2009) ("[S]ection 2B1.1(b) of the Guidelines

was clearly written with the assumption that the amount of loss could be ascertained.").

"If the court is unable to determine [] loss with sufficient certainty, it may rely on the defendant's personal gain from the fraud as an alternate measure of loss." *Zolp*, 479 F.3d at 719 (citing U.S.S.G. § 2B1.1 cmt. n.3(B)). The gain calculation is subject to the same standards as the loss calculation: the government must prove the existence of a gain, the gain amount, and the causal nexus between a gain and the defendant's offense conduct. *Treadwell*, 593 F.3d at 1000; *United States v. Showalter*, 569 F.3d 1150, 1159 (9th Cir. 2009) ("[T]he government bears the burden of proving, by a preponderance of the evidence, the facts necessary to enhance a defendant's offense level under the Guidelines.").

While district courts typically use a preponderance of the evidence standard when finding facts at sentencing, "the government may have to satisfy a 'clear and convincing' standard" of proof if "an extremely disproportionate sentence results from the application of an enhancement." *Zolp*, 479 F.3d at 718. There is no "bright-line rule for the disproportionate impact test," but courts frequently apply the heightened standard if, after reviewing the totality of the circumstances, the enhancement would add more than four levels and more than double the recommended length of the sentence.[6]  As Judge Wilson observed:  where the "loss

---

[6]   *See, e.g.*, *United States v. Jordan*, 256 F.3d 922, 928-34 (9th Cir. 2001) (O'Scannlain, J., concurring) ("Since *Hopper*, we appear to have consistently held that when the enhancement is greater than four levels and more than doubles the applicable sentencing range, then the enhancements must be proved under the 'clear and convincing' standard of proof."); *id.* at 928 (applying clear-and-convincing standard to nine-level enhancement that would more than double the sentencing range); *see also United States v. Gonzalez*, 492 F.3d 1031, 1039 (9th Cir. 2007) (applying the clear-and-convincing standard where the enhancement threatened to add nine levels and would "more than double the length of the sentence authorized by the initial Guideline range"); *United States v. Staten*, 466 F.3d 708, 717–18 (9th Cir. 2006) (holding that clear-and-convincing standard should have been applied to

1   calculation … is the primary driver behind the Guidelines range—more than

2   doubling the offense level and tripling the suggested sentence—[] a clear and

3   convincing standard ought to apply." *United States v. Robles*, No. CR 04-1594 B

4   SVW, 2015 WL 1383756, at *5 (C.D. Cal. Mar. 19, 2015).

5          The clear-and-convincing standard is appropriate here.  None of the facts

6   relating to either loss or gain were established through defendant admission or a jury

7   finding at trial.  Indeed, the government argued at trial that, under the statutes at

8   issue, it did not need to prove any particular loss amount, and the jury's verdict did

9   not make any such determination.  However, it is plain from the trial that the figure

10  the government would suggest for either the loss amount (in excess of $200 million)

11  or the gain amount (in excess of $20 million), if applied, would add *more than 20*

12  *levels* and far more than double Mr. Ficeto's base Guidelines range.  The specific

13  offense characteristic increase, whether based on loss or gain, would be responsible

14  for the vast majority of the sentence length.  This is plainly a circumstance where "a

15  district court is required to ratchet up … the procedural protections afforded a

16  defendant at sentencing, so as more closely to resemble those afforded at trial, by

17  applying the clear and convincing evidence standard." *Staten*, 466 F.3d at 720

18  (internal quotation marks omitted).[7]

19

20  _____

    fifteen-level enhancement that more than doubled the recommended length of

21  sentence).

22  [7]   *See, e.g.*, *United States v. Heine*, No. 3:15-CR-238-SI, 2018 WL 2986212, at *3

23  (D. Or. June 14, 2018) ("Because the advisory sentencing guideline adjustment for
    loss . . . has the potential to exert a substantial upward influence on the ultimate

24  advisory guideline range [by adding 12 to 14 levels], the Court will apply a 'clear
    and convincing' standard for that specific factor."); *United States v. Pollock*, No.

25  3:14-CR-00186-BR, 2016 WL 1718192, at *2 (D. Or. Apr. 29, 2016) ("[T]he

26  potentially significant increase in the guideline range requires the higher standard of
    proof; i.e., Defendant's base offense level could increase from 7 [] to 21[]."); *United*

27  *States v. Wilson*, No. 4:14-cr-00304-JD, Dkt. 50 (N.D. Cal. Feb. 5, 2016) (applying

28  clear-and-convincing standard during evidentiary hearing on loss where the

**1.      The alleged loss is not reasonably calculable.**

Applying these rules, there is not sufficient evidence here that the Court can rely on in establishing a guideline enhancement for loss.

Based on the First Superseding Indictment and the statements from the hedge funds, we expect that the government will argue that the loss amount here is in excess of $200 million.  (We do not know what methodology will be used to come to the loss amount, so we sketch this matter only preliminarily at this point.)  But this number has not been supported by evidence.  And a $200 million figure drives the guideline figure up by 26 points from its initial 7.

What the Guidelines require the government[8] to quantify is clear, but not easy to actually determine: "the reduction that resulted from the offense in the value of equity securities or other corporate assets." U.S.S.G. § 2B1.1 cmt. n.3(C)(v). As the Supreme Court has explained in the civil context, "[g]iven the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will sometimes play a role in bringing about a future loss." *Dura Pharm.*, 544 U.S. at 343. So too, could a host of other factors:

---

enhancement threatened to add between 8 and 14 levels); *United States v. Reyes*, No. 3:06-cr-00556-CRB, Dkt. 737 (N.D. Cal. Nov. 27, 2007) (applying clear-and-convincing standard where loss threatened to add between 18 and 30 levels).

[8]   If the government believes that the hedge fund investors in fact sustained some loss, it bears the burden of explaining and proving that amount.  *United States v. Gushlak*, No. 03-CR-833 NGG, 2011 WL 782295, at *2 (E.D.N.Y. Feb. 24, 2011) (citing *United States v. Donaghy*, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008)); *see also United States v. Markert*, 774 F.3d 922, 923–24 (8th Cir. 2014) (reversing sentence when government failed to prove that nominee loans used to conceal customer overdraft resulted in pecuniary loss; finding that burden to disprove loss had improperly been shifted to defendant); *United States v. Hartstein*, 500 F.3d 790, 796–97 (8th Cir. 2007) (holding that when defendant argued that some alleged losses were in fact legitimate investments, government had the had the burden of showing otherwise).

1        When the purchaser subsequently resells such shares, even at a lower

2        price, that lower price may reflect, not the earlier misrepresentation, but

3        changed economic circumstances, changed investor expectations, new

4        industry-specific or firm- specific facts, conditions, or other events,

5        which taken separately or together account for some or all of that lower

6        price.6

7 *Id*. at 342–43. Indeed, the Sentencing Guidelines themselves specifically note that in

8 determining whether the loss amount

9        is a reasonable estimate of the actual loss attributable to the change in

10        value of the security or commodity, the court may consider, among

11        other factors, the extent to which the amount so determined includes

12        significant changes in value not resulting from the offense (e.g.,

13        changes caused by external market forces, such as changed economic

14        circumstances, changed investor expectations, and new industry-

15        specific or firm-specific facts, conditions, or events).

16 U.S.S.G. § 2B1.1 cmt. n.3(F)(ix).  In this case, that would require disaggregating the

17 loss due to fraud from loss due to any of a variety of other elements; these include:

18      1)      the diminution of the value of the stock based on the fact that the

19           Absolute Funds held virtually all of the shares for the relevant penny

20           stock companies, and that by dumping it all on the market for a quick

21           sale it artificially depressed the value of the stock (i.e., when Absolute

22           Capital's change from holding stock for the long term shifted to quick

23           sale, it flooded the market with supply, leading to a collapse in the

24           stock price that had nothing to do with any fraud); and

25      2)      the impact of the Great Recession and the resulting overall decline in

26           the stock market, including in particular for penny stocks such as the

27           ones at issue here.

28 Both of these are important factors that affected the price of the stock, and thus

24

1   undermine any simple loss analysis.  Under the Guidelines, for securities cases one

2   method to calculate the loss amount is to look at the "average price of the

3   security … during the period that the fraud occurred and the average price of the

4   security … during the 90-day period after the fraud was disclosed to the market."

5   *Id.*.  But the comment cautions that "external market forces" can[9] be considered,

6   such as "changed economic circumstances".

7          While we await a revised PSR, we believe that it will include a loss amount of

8   slightly more than $200 million and that this figure comes from Linda Imes, the

9   attorney for the Absolute Capital hedge funds that sued Mr. Ficeto in New York.

10  Other than that, at this point we do not know the methodology behind the figure, but

11  believe it to be based on the amount the hedge funds paid for the penny stocks

12  versus the amount that they received when they liquidated their positions.  That is an

13  unreliable way of determining the loss amount.

14         The hedge funds purchased virtually all of the available shares of the

15  companies in question.  In effect, they were the market.  Indeed, it was the

16  government's theory that, because the hedge funds controlled virtually all the

17  tradable shares, they could set the market price for the securities.  However, as a

18  result of this, when the hedge funds decided to close out their positions in these

19  stocks, they flooded the market with shares when there was no developed market for

20  a company's shares.  By creating an enormous supply of shares of the penny stock

21  companies – which, by definition, are thinly traded and not well known in investing

22  circles – the hedge funds drove down the price of these shares.  When someone sells

23  their shares in Apple, the market is not affected by the sale because no one person

24  holds sufficient shares to affect the supply/demand curve.  But when the investor

25

26  [9]  While the comment states that such factors "can" be considered, in light of the
    fact that a Court must reasonably determine the amount of loss by clear and
27  convincing evidence, we respectfully suggest that such factors *must* be considered.

28

1   holding all of a company's shares decides to sell them in an illiquid market, there

2   are not sufficient buyers to absorb the shares and the price collapses.  That

3   depression in the price of the shares was not a loss attributable to the fraud, but to

4   the hedge funds' decisions summarily to close out their positions rather than hold

5   them.

6        Similarly, the simple calculation of "amount paid – amount recovered = loss

7   amount" fails to take into account major external factors that were roiling the

8   markets at the time these events transpired.  Florian Homm resigned in September

9   2007.  In the same time frame – summer of 2007 – two Bear Stearns hedge funds

10  collapsed, signaling the beginning of the Great Recession.  While the company's

11  stock traded at $172/share in January 2007, it was sold to JPMorgan Chase for

12  $2/share in March 2008.  In this time frame, financial markets began a nosedive –

13  across the board, stock markets fell.  This market correction – so large that it came

14  to be called the Great Recession – would need to be taken into account when

15  considering the amount of loss here.

16       For example, at trial the government called Mike Petron, who introduced a

17  series of graphs showing increases and decreases in the values of various hedge

18  funds over time, including the increase or decrease in their holdings in penny stocks.

19  But his own tables showed that, as the Great Recession began, the values of hedge

20  funds having none of the penny stocks in question decreased at rates similar to the

21  values of those with penny stocks, sometimes even more precipitously.  (See

22  Exhibits 1111, 1112, 1117.)

23       Mr. Petron testified that, while lots of companies and indices decreased, he

24  had not been asked to attempt to isolate any loss due to fraud separate from

25  macroeconomic market changes:

26       Q.  So during that time frame, many companies lost value.

27       The Dow Jones industrial average decreased substantially; is

28       that fair?

1      A. That's correct.

2      Q. And the S and P 500 decreased?

3      A. That's correct.

4      Q. And the NASDAQ decreased?

5      A. That's correct.

6      Q. And you haven't done any analysis to see whether or

7      not -- you haven't isolated out overall market decreases when analyzing

8          effects on decreases in these NAVs, have you?

9      A. That's correct. I was not asked to do that.

10    (Trial Tr., June 26, 2019, P.M. session, at 56:13-24.)

11         Indeed, in a pre-trial filing, the government itself admitted to the complexity

12    of the loss calculation, arguing that loss calculation would be "extraordinarily

13    complex":

14        In addition to being irrelevant, a discussion of actual losses would be a
          significant waste of time and extremely likely to confuse the issues and
15        mislead the jury, ***because the calculation of such losses can be
          extraordinarily complex in artificial inflation cases***. See, e.g., Berger,
16        587 F.3d at 1042-49 (analyzing various methods for valuating stock in
          such cases and discussing the difficulty of determining precise figures);
17        United States v. Laurienti, 611 F.3d 530, 556-59 (9th Cir. 2010)
          (holding district court erred in calculating losses in artificial inflation
18        scheme and discussing challenges inherent in such calculations);
          United States v. Gushlak, 728 F.3d 184, 188, 196-203 (2nd Cir. 2013)
19        (discussing the calculation of restitution (actual losses) in an artificial
          inflation case; "The challenge, <u>often daunting</u>, is to determine if and to
20        what extent particular investors have been harmed by artificial prices
          that are the result of deliberate misinformation of one sort or another
21        (including manipulative trading practices designed to inflate the
          price)"; "We return to where we began, the inexpertness of most judges
22        in most technical matters, including the forces afoot in the securities
          markets and their impact on the prices for any particular security at any
23        particular time. We must therefore rely on the testimony of
          professionals with appropriate expertise. The district court took great
24        pains in addressing the restitution issues over an extended period of
          time, requiring repeated efforts by the government to obtain a proper
25        valuation for losses under the particular circumstances, and in light of
          the peculiar challenges, presented by the case before it." (emphasis
26        added)).   [T]his topic should be reserved for the Court at sentencing
          instead of presented to the jury at trial.

27    ([Dkt.150] Gov't MIL #2 at 6:13-28 (emphasis added).)  In a stable market,

28

calculation of such losses can be "extraordinarily complex," but in these circumstances, at the outset of the Great Recession, using the raw figures (either amount paid minus amount returned, which seems to be the method used in the PSR, or looking at average price in Period A versus average price in Period B, as the guideline note suggests) and not taking external market developments into account will certainly overstate the proper loss amount.  Indeed, given the tremendous, across-the-board decline in markets for stocks at any capitalization level, the loss amount cannot be calculated with reasonable certainty.

In *Zolp*, the Ninth Circuit grappled with this matter of securities fraud loss calculation, ultimately finding that the district court erred in concluding that the company's shares were "worthless" after revelation of the scheme and making a distinction between "sham" companies and legitimate companies that have residual value after a scheme unravels:

> In making a loss calculation in a case such as this, we must distinguish between fraud relating to a "sham" company and a "pump-and-dump" scheme involving an otherwise legitimate company. Prior cases – and common sense – suggest that a security could be literally worthless after the fraudulent scheme is exposed if the fraudulent scheme involves a "sham" company. If the company whose stock is sold does not legally exist or has no activities, assets, facilities, or any other source of value, that "company" has no underlying equity. Absent highly unusual circumstances, its stock would also be worthless. *See, e.g., United States v. Mayo,* 646 F.2d 369, 374 (9th Cir.1981) (purpose of conspiracy involving "sham corporations" was "bilking the unsuspecting public by foisting worthless stock upon it"). In such a case, the court could appropriately determine the loss to be equal to the value of all outstanding shares before the fraud came to light.[3]
> Measurement of loss becomes considerably more complex,

28

however, when the court confronts a "pump-and-dump" scheme
involving an otherwise legitimate company. In such a case, because the
stock continues to have residual value after the fraudulent scheme is
revealed, the court may not assume that the loss inflicted equals the full
pre-disclosure value of the stock; rather, the court must disentangle the
underlying value of the stock, inflation of that value due to the fraud,
and either inflation or deflation of that value due to unrelated causes.
*See United States v. Bakhit,* 218 F.Supp.2d 1232 (C.D.Cal.2002)
(thoughtfully analyzing several approaches to this task). *See also*
Eisenhofer, Jarvis, & Banko, *Securities Fraud, Stock Price Valuation,
and Loss Causation: Toward a Corporate Finance-Based Theory of
Loss Causation,* 59 Bus. Law. 1419 (2004) (discussing the challenges
of such calculations in the context of civil securities fraud). *Cf. Dura
Pharm., Inc. v. Broudo,* 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161
L.Ed.2d 577 (2005) (requiring plaintiffs in civil securities fraud cases
to establish a "causal connection between the material
misrepresentation and the loss"); *In re Daou Sys., Inc.,* 411 F.3d 1006,
1014 (9th Cir.2005) (construing and applying *Dura* ).

*United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007).  Here, the government did
not allege, nor did the evidence at trial suggest, that the penny stock companies were
"sham" companies.  They were not.  Indeed, witnesses from some of these
companies – including Sam Chapman from Berman Center and Doug DeLuca from
Pro Elite – testified at trial.  All of these were real, functioning companies, not
"sham" companies.  As a result, the residual value needs to be determined in order
to determine the loss due to fraud.[10]

---

[10]   As the Court will recall, this issue was previewed before the trial when Mr.
Ficeto's counsel emphasized that the government's witnesses (in particular, their

1    In a follow-on case to *Zolp*, the Ninth Circuit remanded a securities fraud

2    conviction for re-sentencing where the trial court had not taken into account the

3    bursting of the preceding stock market bubble, in 2000, when calculating the loss

4    attributable to the fraud:  "Although the district court here accounted for 'the

5    underlying value of the stock,' it did not account for the market forces that also

6    contributed to the decrease in stock value. It is undeniable that, in addition to the

7    fraud, the market's drop in 2000 had an effect on stock values."  *United States v.*

8    *Laurienti*, 611 F.3d 530, 558 (9th Cir. 2010).

9    Quantifying the loss attributable to fraud, and finding it by clear and

10   convincing evidence, is not possible here, given the turmoil in the markets caused

11   by both (a) the unloading of so much stock at once, and (b) external macroeconomic

12   factors across markets at the time.  Certainly, the government has not introduced

13   evidence to make such a finding, and it was not wrong in saying such a calculation

14   would be "extraordinarily complex."

15   It bears noting that this other courts have grappled with this same issue.

16   There has been an ongoing criminal proceeding in Switzerland against Florian

17   Homm and others.  Recently, the Swiss tribunal rejected the prosecution's case

18   because three different loss amounts had been advanced for the hedge funds:

19   The [Federal Public Prosecutor's Office] presents, repeatedly,

20   amounts, always different, invested by the Fonds Absolute in the U.S.

21   Penny Stocks. On page 21, the amount that the Fonds Absolute would

22   have invested in the US Penny Stocks reaches USD 126,100,000

23   _____

24   designated expert, Mr. Cangiano) should not be able to testify that the stock price
     was over-valued because he had not done an analysis of the value of the company
25   based on its fundamentals.  During trial, Mr. Cangiano admitted that he had not
     done any such analysis, and when Mr. Ficeto's counsel asked the government's
26   other non-designated expert witnesses (such as Mr. Petron and Mr. Melley) if they
     had done any analysis of the companies' intrinsic value, they admitted they had not.
27

28

1   (which is the total amounts mentioned for each type of Penny Stocks),

2   from September 2004 to September 2007. On page 32, as of August

3   31st, 2007, the amount invested by the Fonds Absolute in US Penny

4   Stocks would reach a total of EUR 389 million. On page 41, on the

5   chapter of damages, the Fonds Absolute would have invested, from

6   2004 to September 2007, USD 229,408,798 in US Penny Stocks.

7   Notwithstanding the issue of currency exchange, these are three

8   entirely different amounts.

9          As these inaccuracies prevent from achieving a clear picture of

10   the situation, the prosecution is in violation of the accusatory principle.

11   (Reichert Decl. Exh. 1 at 8-9 ¶ 3.5.)

12   The loss amount cannot be determined by clear and convincing evidence.

13   **2.      The alleged gain is also impossible to calculate with reasonable**

14   **certainty.**

15          If the Court determines that there is some loss but that "it reasonably cannot

16   be determined," the Court "shall" look instead to "the gain that resulted from the

17   offense as an alternative measure of loss." U.S.S.G. § 2B1.1 cmt. n.3(B).  Whether

18   looking at loss or gain, "the government bears the burden of proving . . . the facts

19   necessary to enhance [the] defendant's offense level under the Guidelines." *United*

20   *States v. Showalter*, 569 F.3d 1150, 1159 (9th Cir. 2009). Accordingly, to apply any

21   enhancement based upon Mr. Ficeto's gain from the offense, the government must

22   prove the existence of a gain, the gain amount, and the causal nexus between the

23   gain and Mr. Ficeto's offense conduct. *United States v. Treadwell*, 593 F.3d 990,

24   1000 (9th Cir. 2010); *United States v. Berger*, 587 F.3d 1038, 1047–49 (9th Cir.

25   2009). And, as addressed above, while the amount need not be determined with

26   absolute precision, but the government still must: (a) "use a rational calculation

27   method" "grounded in sound economic principles," *United States v. Hance*, 501

28   F.3d 900, 909 (8th Cir. 2007); *United States v. Ferguson*, 584 F. Supp. 2d 447, 451

(D. Conn. 2008); (b) rest its estimate on "reliable and specific evidence," *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007); (c) exclude "[gains] from causes other than the fraud," *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007); and (d) show that its narrow gain estimate is "reliable," *Hance*, 501 F.3d at 909; *Treadwell*, 593 F.3d at 1000. Speculative estimates of the gain amount are forbidden. *Medina*, 485 F.3d at 1304 ("[C]ourts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines."); *United States v. Rosacker*, 314 F.3d 422, 426 (9th Cir. 2002) ("Any estimate—including a conservative one—must be supported by reliable information."); *id.* at 425 ("[T]he information which supports an approximation must possess sufficient indicia of reliability to support its probable accuracy." (internal quotation marks omitted)).  As with loss, the gain amount must be established by clear and convincing evidence, since it is likely that the government will contend that the gain amount figure would substantially increase Mr. Ficeto's Guidelines range.

Here, Mr. Ficeto's gain cannot be reliably calculated, because Mr. Ficeto's income resulted both from money earned from the questioned transactions as well as from legitimate business transactions.  The government has not made an effort to disentangle these two different aspects of his income and, absent doing so, the gain amount *attributable to the wrongful conduct* cannot be ascertained.  As shown at trial, the cross-trades constituted only 1% of the total trades at Hunter World Markets.  Mr. Ficeto had a successful business before Florian Homm became his business partner.  The government has never contested that all of Mr. Ficeto's income and assets were the proceeds of fraudulent activity.  At trial, the amount of gain was not an essential element of any count, and there has been no evidence to disaggregate fraudulent and legitimate income.

Finally, as the Ninth Circuit noted in *Zolp*, section 2B1.1 focuses on the "defendant's *personal* gain" from the offense. *Zolp*, 479 F.3d at 719 (emphasis

1   added). A "realistic, economic approach" to that calculation should focus only on

2   what the defendant took home *net* of tax.  *United States v. Crandall*, 525 F. 3d 907,

3   912 (9th Cir. 2008).  After all, loss and gain calculations must be grounded in

4   "economic reality." *United States v. Smith*, 951 F.2d 1164, 1167 (10th Cir. 1991)

5   ("[I]t is a net value that must be used to measure loss. Any other approach ignores

6   reality.").

7        As noted at the outset, Mr. Ficeto paid annual income taxes on his income

8   from HWM.  As part of its investigation, the government obtained Mr. Ficeto's tax

9   returns from the IRS.[11]  While Mr. Ficeto earned millions of dollars over these

10   years, he also paid millions of dollars to the IRS (and well as to California).  Even if

11   the Court could isolate and quantify the amount of his gain attributable to the fraud,

12   it would massively overstate Mr. Ficeto's *actual* gain from the offense if the Court

13   did not discount that gain by the taxes Mr. Ficeto paid to both the United States and

14   California.  But, as of now, the government has not met its burden of establishing

15   gain by clear and convincing evidence.

16        Because neither the loss amount nor the gain amount can be reliably

17   calculated by clear and convincing evidence, the Court should not increase the

18   offense level pursuant to § 2B1.1(b)(1).

19   **C.    Considering All These Factors, The Court Should Impose A Sentence Of**

20        **Probation.**

21        In light of the factors to consider under § 3553, including the age of the case,

22   the disparities in punishment relating to other individuals involved in this

23   wrongdoing, the personal punishment that Mr. Ficeto has endured over the past

24   thirteen years, and the difficulty in establishing reliable loss or gain amounts by

25   clear and convincing evidence, Mr. Ficeto respectfully asks the Court to impose a

26

27   ---
[11]  We have refrained from filing these tax returns, but they are available should the
Court need to see them or if it decides that an evidentiary hearing is appropriate.

28

1  sentence of probation.

2

3  DATED:  February 3, 2020          Gary S. Lincenberg
                                     Thomas V. Reichert
4                                    Bird, Marella, Boxer, Wolpert, Nessim,
5                                    Drooks, Lincenberg & Rhow, P.C.

6

7                                    By:

8                                    _____
                                          Thomas V. Reichert
9                                    Attorneys for Defendant Todd Michael
10                                   Ficeto

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28