Gary S. Lincenberg - State Bar No. 123058
    glincenberg@birdmarella.com
Thomas V. Reichert - State Bar No. 171299
    treichert@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant
Todd Michael Ficeto

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FLORIAN WILHELM JURGEN HOMM, TODD MICHAEL FICETO, COLIN HEATHERINGTON, and CRAIG HEATHERINGTON,<br><br>Defendants. | CASE NO. 2:13-CR-00183 VAP<br><br>**Todd Ficeto's Brief In Response To Government's Sentencing Position**<br><br>Date:   March 23, 2020<br>Time:   9:00 a.m.<br>Crtrm.: 8A |

3634586.1

1    The Government's Sentencing Position Brief [Dkt. 286] recognizes that the mindless application of the sentencing guidelines would be improper here. However, the government's recommendation of 8 years (96 months) remains far too high, and fails to recognize the gross disparities that would result from such a sentence.

This case revolved around manipulation of share prices of certain penny-stock companies for the express purpose of inflating the portfolio values of a group of European hedge funds. According to the testimony at trial from Craig Heatherington – who received a DPA from the government – Florian Homm would dictate to Colin Heatherington the results that he wanted for each hedge fund, and Colin would then calculate stock prices that would get them to the stated goal. Colin would then place the trades with Tony Ahn. The government introduced numerous examples at trial of instant messages between Colin Heatherington and Tony Ahn where Colin was dictating closing prices to Tony Ahn. As Tony Ahn testified at trial, he would then place one of two types of trades to get a particular stock price there. In some instances, where there were available shares in the market – which meant that there was, in fact, a real market for these stocks – Tony would place trades in quantities that would drive the price of the stock up to the desired number. In other instances, where different hedge funds owned blocks of shares, Tony Ahn would place a cross-trade between the hedge funds, which allowed him to simply set a price, since he was placing a trade for both the buyer and seller of the security.

As noted in Todd Ficeto's opening brief, the government declined to prosecute Mr. Ahn. It also declined to prosecute Ms. Pagliarini, the compliance officer who approved all of the trades that form the basis of Mr. Ficeto's conviction. While Colin Heatherington's fate remains uncertain, as he battles extradition, both Craig Heatherington and Sean Ewing received DPAs from the government. The government downplays Mr. Ewing's culpability in its brief, but the facts don't

support this.  The government's own witness, Darius Parsi, provided damning testimony about Mr. Ewing's knowledge, involvement and culpability.  According to Mr. Parsi's testimony, after Mr. Parsi sent a pseudonymous whistleblower email to numerous third parties, Ewing managed to find out it was Mr. Parsi who sent the email.  Mr. Ewing then contacted Mr. Parsi and was sufficiently threatening that Mr. Parsi agreed to retract his allegations, testifying that he was worried about his own safety and the safety of his family.  Thus, Mr. Ewing, the Chairman of the Board and CEO of Absolute Capital, was placed on notice of Florian Homm's stock price manipulation, and his response was to cover it up through threats and intimidation.  When Mr. Ewing reported it to the Board of Directors, he failed to tell them that it was Darius Parsi – a former member of the same Board of Directors – who made the report, he failed to provide details, he falsely stated that an investigation had been conducted that did not substantiate the allegations and, when asked for a copy of the email by another board member, he declined to provide it.  He then continued as CEO, knowing this was going on, for another year.  Despite this, Mr. Ewing received a DPA and paid $8 million – less than a tenth of his wealth – to make this go away.  Mr. Ewing was the head of the company in question, knew about and covered up the fraud, and made enormous amounts of money as the CEO as the company went public and then performed very well based on Homm's manipulated NAVs.  And he paid his way out of this.  Now, he is a free man with tens of millions of dollars in the bank.

     As of now, the only person who has been incarcerated was Florian Homm. He was detained in an Italian jail (and then a hospital, based on his health issues) for approximately fourteen months.  He is now outside the reach of U.S. extradition. Given this, the government's request for a sentence of 8 years for Todd Ficeto is inequitable.  The only person who served time was detained for 14 months.  Sean Ewing received no time.  Craig Heatherington received no time.  Tony Ahn and Elizabeth Pagliarini received no time.  Having all of the punishment fall on one

person – because he decided not to flee (even with $10 million in an overseas bank account), but to stay and have his day in court – would be deeply unjust, particularly in light of how involved people such as Tony Ahn and Sean Ewing were, or how Elizabeth Pagliarini, the compliance officer, signed off on each trade. (Indeed, the testimony of all of the government's regulatory witnesses and experts could as easily have convicted Ms. Pagliarini as Mr. Ficeto.)

As the government notes, this is a case that is extremely old. The significance of this is that, by the time Mr. Ficeto was indicted, he had already lived with a set of escalating consequences from this conduct for over eight years; by the time he went to trial, it had been twelve years since Homm disappeared. In the interim, he dealt with civil litigation by an investor, and then by the hedge funds, and then by the SEC, and then asset forfeiture by the government. Mr. Ficeto always acted uprightly in handling these matters, and worked cooperatively with the government on the asset forfeiture cases. In the end, between the amount he forfeited and the amount he paid for counsel, Mr. Ficeto was largely stripped of everything he owned. At the same time, his personal life was in turmoil, with his marriage ending, his business closing and not being able to secure a job. The psychological toll that this has taken on Mr. Ficeto is not something that can be quantified; because it cannot be quantified, such things are often discounted. But this has been the central story of Mr. Ficeto's life for the past twelve years, and the damage to his family and his person should not be discounted as the Court decides how he should be further punished.

In various places, the government overstates the facts in support of its effort to paint Mr. Ficeto as a man deserving an 8-year sentence. While many of these points are addressed in our opening brief, we respond to a few here that bear special mention.

First, the penny-stock companies were real companies, a point that bears emphasizing. These were small companies looking for money to build their

businesses.  While in most instances, Hunter World Markets assisted in helping them go public, that was not true in every case.  For example, MicroMed, a company focused on developing heart valve technology, had already gone public and received rounds of financing before the Absolute Capital hedge funds invested in it.  And there were a number of companies where there were various investors other than the Absolute Capital hedge funds; MicroMed was one, but ProElite was another – in the case of ProElite, CBS made a significant investment, and ProElite had a contract with Showtime to broadcast mixed martial arts fights on the Showtime network.  In the end, UFC became the dominant player in this space, but ProElite was its main competitor for a time, as Doug DeLuca testified.

   Not only were these real companies, but the transactions were all handled in the ordinary way.  Tom Poletti (formerly of KL Gates, now at Manatt, Phelps & Phillips) and David Ficksman (at Troy & Gould) handled various securities offering transactions, and they testified that nothing about them was out of the ordinary.

   Second, while the government returns to Mr. Ficeto's convictions for failure to advise the SEC of the use of an Instant Messaging system, in May 2008, and failing to advise the SEC in September 2008 of the existence of an overseas bank account, it fails adequately to acknowledge that it was Mr. Ficeto, through his counsel, who provided the IMs to the government and who voluntarily informed the SEC of the overseas account.  This is not the stuff of the ordinary fraud case, or the ordinary "pump and dump" case.  The fact of the jury's conviction on these counts must be tempered by the fact that Mr. Ficeto acted quickly, and voluntarily, to correct these matters.  It is simply not the profile of an ordinary fraud case where the subject comes back to volunteer a correction of something as significant as the existence of an overseas back account.

   Nor is it the ordinary fraud case where the defendant pays his taxes – the government has never contended otherwise – and discloses the holdings of his foreign bank account to the IRS.  Once again, this case calls out for a fuller picture

than what the government has offered, or what we believe the PSR will reflect.  It is notable that Mr. Ficeto used respected estate planning counsel to set up this offshore trust, and that he then filed annual reports about it with the IRS.  While we respect the jury's verdict, many of the facts here regarding Todd Ficeto's conduct do not reconcile with that verdict and call out for seeing this as a case with many shades of gray, not just a picture in black and white.  And, as this Court knows from its experience, the task of sentencing a defendant is the most serious obligation of any judge, and calls out for the most sober and inclusive consideration of the facts in order to impose a just punishment.

      The government acknowledges that any loss amount needs to take account only of the loss that is related to the fraud, and that the stated loss amounts do not disaggregate "fraud-based loss" from other factors that may have been involved in the loss.  The government does not attempt to take on this task; as it noted in its motion in limine, "the calculation of such losses can be extraordinarily complex in artificial inflation cases."  But where there is no effort to undertake such a disaggregation, and where the sentencing enhancement requires a finding, based on clear and convincing evidence, of the loss due to the fraud (and not anything else) to determine the appropriate increase in levels, the sentencing enhancement should not be added in the first place.  The government justifies its request for a variance based on an inability to disaggregate elements of the loss, but that inability should, rather, eliminate the initial increase – which here is in the range of 26 levels.[1]

      Considering the various factors under § 3553, the treatment of other participants in this scheme, the age of the case and the personal suffering that the past twelve years have imposed on Mr. Ficeto, and the difficulty of establishing loss,

---

[1] The same problem of determining loss affects the restitution calculation; however, defendant will address this in further detail in response to the updated PSR, once it is filed.

1  Mr. Ficeto respectfully submits that a term of probation is appropriate.

3  DATED:  February 10, 2020          Respectfully submitted,

Gary S. Lincenberg
Thomas V. Reichert
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:    /s/ Thomas V. Reichert
            Thomas V. Reichert
      Attorneys for Defendant Todd Michael
      Ficeto