NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
Assistant United States Attorney
Deputy Chief, General Crimes Section
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Major Frauds Section
IAN V. YANNIELLO (Cal. Bar No. 265481)
General Crimes Section
    1500/1100/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0363/6527/3667
    Facsimile: (213) 894-6436/6269
    E-mail:   cassie.palmer@usdoj.gov
           scott.paetty@usdoj.gov
           ian.yanniello@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 13-183-VAP |
|---|---|
|     Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT TODD MICHAEL FICETO'S SENTENCING MEMORANDUM |
|     v. | |
| TODD MICHAEL FICETO, | Hearing Date: March 23, 2020 |
|     Defendant. | Hearing Time: 9:00 a.m. |
| | Location:   Courtroom of the Hon. Virginia A. Phillips |

      Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Cassie D. Palmer, Scott Paetty, and Ian V. Yanniello, hereby files its Response to Defendant Todd Michael Ficeto's Sentencing Memorandum.

This response is based upon the attached memorandum of points and authorities and exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 10, 2020          Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division


_____
           /s/
CASSIE D. PALMER
SCOTT PAETTY
IAN V. YANNIELLO
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION................................................1

II.   THE PARTIES' AGREEMENT REGARDING SENTENCING.................2

III.  3553(a) Factors.............................................2

      A.    Nature and Circumstances of the Offense; History and
            Characteristics of the Defendant......................2

      B.    Defendant Was Not Acting in "Good Faith"..............8

            1.    Defendant's Lengthy History in Trading and
                  Regulatory Sanctions............................8

            2.    Assistance to Absolute Funds....................10

            3.    Defendant's Lies and Attempts to Hide Behind
                  Others..........................................11

      C.    The Government's Recommended Sentence Would Not Result
            in Unwarranted Sentencing Disparities But Defendant's
            Recommended Probationary Sentence Would...............12

            1.    Florian Homm....................................12

            2.    Colin Heatherington.............................12

            3.    Sean Ewing......................................13

            4.    Craig Heatherington.............................13

            5.    Pagliarini and Ahn..............................14

            6.    Sentences in Other Cases........................15

      D.    General Deterrence....................................16

IV.   LOSS CALCULATIONS...........................................17

V.    CONCLUSION..................................................19

i

**TABLE OF AUTHORITIES**

**Federal Cases**

S.E.C. v. Durante,
   641 F. App'x 73 (2d Cir. 2016) ..................................... 15

United States v. Berry,
   258 F.3d 971 (9th Cir. 2001) ....................................... 17

United States v. Georgiou,
   777 F.3d 125 (3d Cir. 2015) ........................................ 15

United States v. Littlesun,
   444 F.3d 1196 (9th Cir. 2006) ...................................... 17

United States v. Olis,
   429 F.3d 540 (5th Cir. 2005) ....................................... 18

United States v. Petty,
   982 F.2d 1365 (9th Cir. 1993) ...................................... 17

United States v. Pham,
   545 F.3d 712 (9th Cir. 2008) ....................................... 17

United States v. Rutkoske,
   506 F.3d 170 (2d Cir. 2007) ........................................ 18

United States v. Schwamborn,
   467 F. App'x 35 (2d Cir. 2012) ..................................... 15

United States v. Schwamborn,
   542 F. App'x 87 (2d Cir. 2013) ..................................... 15

United States v. Zolp,
   479 F.3d 715 (9th Cir. 2007) ....................................... 17

Williams v. New York,
   337 U.S. 241 (1949) ................................................ 17

**Federal Statutes**

18 U.S.C. § 3553 ................................................. 2, 11
18 U.S.C. § 3559 .................................................... 1
18 U.S.C. § 3561 .................................................... 1

**Other**

U.S.S.G. § 2B1.1 .................................................... 18
U.S.S.G. § 3C1.1 ..................................................... 6
U.S.S.G. § 5B1.1 ................................................. 1, 2
U.S.S.G. § 6A1.3(a) ................................................. 17

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        Defendant Todd Michael Ficeto ("defendant") filed a sentencing

4   recommendation requesting a probationary sentence.  Such a sentence

5   not only strains credulity but also is impermissible.[1]  The evidence

6   presented at trial established that defendant played a vital and

7   necessary role in carrying out a sophisticated, multi-national stock

8   manipulation scheme through which he and his co-conspirators Florian

9   Homm ("Homm") and Colin Heatherington stole more than $200 million

10  dollars from the Absolute Funds.  The jury agreed and convicted

11  defendant of 18 felonies (including eight Class B felonies).  These

12  convictions related not only to defendant's integral role in the

13  execution of the fraud, but also to the series of lies defendant told

14  and the obstructive conduct he systematically undertook in his futile

15  attempts to cover up his crimes.  Defendant sought to shield himself

16  from culpability by hiding behind and putting in harm's way those who

17  trusted him—first, his employees, who lost their licenses and

18  livelihoods, and then his father, who defendant installed as the sham

19  executor of a foreign trust defendant created to hide the ten million

20  dollars he transferred off-shore mere days before his testimony

21  before the Securities and Exchange Commission (an account defendant

22  then lied about under oath).  Even if a probationary sentence were

23  permissible (which it is not), to adopt defendant's recommended

24  _____

25        [1] See 18 U.S.C. § 3559(a)(2) ("An offense that . . . [where] the
    maximum term of imprisonment authorized is . . . twenty-five years or
26  more [is] a Class B felony"); 18 U.S.C. § 3561 ("A defendant who has
    been found guilty of an offense may be sentenced to a term of
27  probation unless . . . the offense is a Class A or Class B felony");
    U.S.S.G. § 5B1.1(b)(1) (a sentence of probation "may not be imposed"
28  if "the offense of conviction is a Class A or B felony").

1  sentence, the Court would need to apply a 31-level variance to

2  defendant's total offense level of 43[2] (PSR ¶ 62), in order to move

3  defendant into Zone B, the threshold for probation.  See U.S.S.G.

4  § 5B1.1(a)(2).  Such a drastic deviation from the Sentencing

5  Guidelines is not supported by the facts and does not comport with

6  the goals of 18 U.S.C. § 3553(a).  In the interests of justice, the

7  government has recommended a significant downward variance in this

8  case (15 levels), which is just and adequately accounts for the

9  arguments that defendant raises in his sentencing memorandum.

10  **II.   THE PARTIES' AGREEMENT REGARDING SENTENCING**

11       As noted in its sentencing position, the government reiterates

12  that it recommends a sentence 96 months' imprisonment.  The

13  government entered into the agreement in exchange for defendant's

14  waiver of his right to file post-trial motions and to appeal his

15  convictions and sentence, so long as the sentence the Court imposes

16  does not exceed the statutory maximum term of imprisonment.  (CR 281

17  ¶¶ 3-5, 8.)

18  **III.  3553(a) Factors**

19       **A.   Nature and Circumstances of the Offense; History and**
          **Characteristics of the Defendant**

20

21       **Defendant's Role in the Scheme:**  In his sentencing memorandum,

22  defendant seeks to minimize the role he played in the scheme by

23  noting that he did not have contact with investors in the Absolute

24  Funds and did not control Homm's activities at the Funds.  (Def. Mem.

25  at 4-5.)  In so doing, defendant ignores his vital role and criminal

26

27

28       [2] Aside from vaguely challenging the loss amount calculations in
    the PSR, defendant does not specifically challenge the base offense
    level or enhancements adopted in the PSR.

2

1   partnership with Homm and Colin Heatherington.  Defendant and Homm

2   enjoyed a long business relationship together and jointly owned HWM.

3   Defendant managed HWM and controlled its day-to-day operations,

4   including approving all of the manipulative trades at the heart of

5   the securities fraud scheme.  Defendant also managed HWM's

6   investment-banking arm through which he personally located the penny

7   stock companies and arranged financing deals to take the companies

8   public, generally through a reverse-merger process involving shell

9   companies that defendant owned.  It was the defendant who arranged

10  financing deals whereby the Absolute Funds (via Homm) would invest

11  millions of dollars in the penny stock companies in order to acquire

12  a majority of the new company's stock.  Through these deals,

13  defendant and Homm paid themselves substantial placement agent fees

14  out of the Absolute Funds' coffers and also issued themselves — and

15  their co-conspirators — millions of shares in the penny stock

16  companies, of which the co-conspirators controlled a significant

17  portion of the freely tradable shares.  Through their coordinated

18  efforts, the criminal conspiracy then artificially inflated the

19  prices of those penny stocks in order to pump up the net asset value

20  of the Absolute Funds and create the false impression to investors

21  that Homm's investment strategies were highly profitable, which

22  enabled Homm to lure unwitting investors.  These investors never

23  would have invested in the Absolute Funds had they been aware that

24  their investments would be placed in penny stocks or if they knew the

25  Absolute Fund's reported profits were based on defendant and HWM's

26  continuous stock manipulation.  (Trial Tr., 28, June 14, 2019 (PM),

27  attached hereto as Ex. 1; FBI interview of Lawrence Wang, July 24,

28  2014302 at 2, attached hereto as Ex. 2.)

1  Defendant also was the founder and investment adviser of the
2  Hunter Fund, an investment fund, whose sole investors were three of
3  the Absolute Funds—Return Europe, Catalyst, and Octane.  Defendant
4  used the Hunter Fund to enrich himself and to mask investments by the
5  Absolute Funds in the penny stock companies.  As the registered
6  investment adviser to the Hunter Fund, defendant owed the Fund a
7  fiduciary duty, which he repeatedly violated by placing his own self-
8  interest in enriching himself above the interests of the Fund.

9  **Defendant's Lies, Obstruction, and Sworn False Statements:**
10  Defendant's request for probation ignores aggravating facts relating
11  to his attempts to evade detection and cover up his crimes through
12  lying and instructing others to lie.  To achieve the goal of
13  manipulating penny stock prices, defendant specifically directed his
14  head trader, Ahn, to use a secret, unarchived Microsoft Windows IM
15  system, which was impermissible under FINRA and SEC rules, precisely
16  because those messages were not automatically archived (and
17  accordingly would not be subject to regulatory oversight).  Defendant
18  further instructed Ahn regarding how to answer questions posed by
19  regulators, advising Ahn that "I don't recall," is a good answer.
20  Then, in response to investigators' requests for information about
21  HWM and defendant's role in it, defendant falsely claimed that he was
22  not involved in trading and also falsely stated that HWM received
23  trading instructions from the Absolute Funds only via telephone
24  calls, email, and archived IMs via the Bloomberg system.  Defendant's
25  claim that he was not involved in trading was contradicted by all of
26  the HWM witnesses.  As Anita Razo, Elizabeth Pagliarini, and Tony Ahn
27  testified, defendant was acutely aware of everything that went on at
28  HWM—and even listened in on employees' telephone calls.  (Trial Tr.,

98-100, June 12, 2019 (AM), attached hereto as Ex. 3; Trial Tr., 88, June 12, 2019 (PM), attached hereto as Ex. 4; Trial Tr., 94, June 26, 2019 (PM); attached hereto as Ex. 5; Trial Tr., 18, June 18, 2019 (AM), attached hereto as Ex. 6.)  And, contrary to defendant's claims that Tony Ahn was responsible for all trading, defendant's name appears consistently throughout the secret IMs as the person who had to approve of all trades.  (See Ex. 6 at 18-19.)  In numerous secret IMs discussing penny stock trades, Colin Heatherington asked Tony Ahn for a report on defendant's whereabouts and expressed a desire to talk to defendant about the trades.  Defendant even personally traded at the end of the month when Ahn was out for his child's birth.  The need for defendant to know about and approve HWM's stock trades on behalf of the Absolute Funds, which comprised the vast majority of HWM's business, was clear, and undermines defendant's protestations to the contrary.

After Homm's departure from the Absolute Funds, defendant attempted to conceal the proceeds of the fraud through June 2008 by laundering the conspirators' ill-gotten gains through a series of wire transfers to himself, Homm, and Colin Heatherington, including by transferring nearly $10 million into a foreign bank account defendant owned days before his SEC testimony.  Defendant then lied to the SEC in writing under penalty of perjury and when testifying under oath about this bank account: (1) defendant falsely stated that he did not have any foreign bank accounts in his responses to the SEC's background questionnaire; and (2) confirmed that false answer on two occasions when questioned under oath about foreign bank accounts.  Notably, to conceal his foreign assets and distance

himself from his criminal profits, defendant installed his father as the trustee of this account.

Importantly here, defendant doubled down on several of these lies from the witness stand at trial. While the government did not seek a two-level upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1, defendant's choice to testify untruthfully at trial is an aggravating factor that supports the government's recommended sentence of sentence of 96 months' imprisonment and militates against defendant's requested probationary term.

**Defendant Richly Profited from the Scheme:** Defendant personally profited by receiving millions of dollars in placement fees for the penny stock financing deals and making millions more in fees and commissions from HWM by executing the manipulative stock trades. Defendant lined his pockets with millions more by engaging in self-dealing trades (often in lock-step with his co-conspirators, which evinces their close coordination in the scheme) in which defendant and his conspirators sold their shares in the penny stock companies to the Absolute Funds. Defendant used these funds to buy lavish homes, luxury cars, and even a yacht with his co-conspirators, which they named "No Remorse." By his own admission, defendant personally garnered over $27 million through HWM during the fraud scheme. (See Trial Ex. 772 at 23, Ex. 1 to Gov't Sent. Mem.)

Notably, the government credits certain mitigation referenced in defendant's sentencing memorandum, including defendant's efforts to improve his life after the offense conduct by, among other things, obtaining bachelor's and master's degrees and focusing on caring for his family. The government agrees that this conduct is mitigating and has accounted for these mitigating facts in its recommendation

that defendant be sentenced to 96 months' imprisonment.  Defendant's position seeking a probationary sentencing, however, fails to address the factors justifying a 96-month sentence.  For example, unlike many defendants who come before this Court to be sentenced, defendant has not had to overcome a great deal of adversity in his life.  At the time of the offense, defendant enjoyed a loving, supportive family and a productive livelihood and stable employment.  Thus, unlike many defendants, he did not commit his crimes out of economic desperation, or because of unaddressed mental health issues or to support a drug addiction.  Defendant's crimes were driven by greed and opportunism.  Based upon the totality of the circumstances, a 96-month sentence is just and appropriate.

**Defendant Was Fully Aware of the Scheme:**  Contrary to defendant's assertions that he was unaware of "yellow" or "red" flags with respect to trades in the penny stock companies (Def. Mem. at 2, 4 n.2), evidence at trial left no doubt that defendant displayed a disregard for the proper functioning of a free and open market and a willingness to keep the pipeline of penny stocks flowing to Homm and the Absolute Funds despite warnings that such practices were dangerous.  Defendant's actions and coordinated efforts alone, including approving and executing his self-dealing trades in lock-step with his co-conspirators, show that he knew exactly what he was doing.  His attempts to hide the scheme from regulators and his repeated lies only strengthen this conclusion.  Further, HWM employees testified that defendant watched everything that happened at HWM closely and that nothing was approved without his endorsement.

Notably, there also was evidence presented at trial showing defendant's specific knowledge that his actions were harmful to the

Funds.  Darius Parsi, a co-manager of the Absolute Return Europe
Fund, testified that he warned defendant years before the scheme
unraveled to stop bringing penny stocks to Homm, and defendant
replied that Parsi should mind his own business.  (Trial Tr., 67-68,
June 25, 2019; attached hereto as Ex. 7.)  This demonstrates what all
of the evidence above makes clear: defendant was specifically aware
of all aspects of the scheme that he helped perpetuate, including the
negative effects of the penny stocks on the Funds and, in fact, had
no remorse for the staggering amounts that the conspiracy generated
at the expense of the Absolute Funds.  When Parsi asked if defendant
was concerned that what defendant and Homm were doing likely was
securities fraud, defendant acknowledged that it probably was but
quipped that the SEC was too overworked and understaffed to catch
them.  (Ex. 7 at 68-69.)  On balance, defendant's role in the scheme
and his history and characteristics warrant a 96-month sentence, not
probation.

**B.   Defendant Was Not Acting in "Good Faith"**

Defendant's references to his "good faith" are misleading.
(Def. Mem. 5, 9.)  As demonstrated at trial, defendant's actions were
the opposite of good faith.

1.   Defendant's Lengthy History in Trading and Regulatory
Sanctions

At the time of the fraud, defendant had nearly twenty years of
experience in the securities industry.  (Trial Ex. 608 at 9-10,
attached hereto as Ex. 8.)  He also had a lengthy history of
regulatory violations, which undercuts his claim that he was unaware
of suspicious trading in penny stocks and inadvertently "ignored
certain yellow or red flags."  (Def. Mem. at 4 n.2.)

8

A closer look at defendant's violations is warranted.  Defendant consented to a judgment and $9,541 fine against him in February 1996 for "Violation of the Penny Stock Rule," which barred him from recommending any transactions in penny stocks for two years, for "effect[ing] 18 transactions in a penny stock," amounting to approximately $36,500, while failing to make the following disclosures to customers: (1) the risks of penny stock investments; (2) the inside bid and offer quotes and number of shares to which these quotes applied; (3) the total amount of compensation he received in connection with penny stock transactions; and (4) failing to deliver to each customer a "suitability statement" according to SEC rules.  (Ex. 8 at 19-22.)

Furthermore, in June 2002, defendant consented to a fine and judgment against him for failing to report customer complaints to the NASD and executing equity securities transactions through his firm, VMR Capital Markets, without being registered as an equity trader. (Ex. 8 at 22-23.)  Then, in December 2004, defendant was sanctioned and fined again at VMR Capital Markets for failing to comply with NASD rules and failing to supervise an employee who excessively traded in securities.  (Ex. 8 at 25-26.)  Indeed, because defendant failed to comply with the rules, FINRA required that defendant be supervised under a "heightened supervision plan," which required, among other things, that defendant hire a compliance officer.  Rather than use the supervision plan to ensure his compliance with the law, however, defendant found a way to manipulate it and his compliance officer to conceal the fraudulent scheme for years.

Defendant's regulatory sanctions provide context for defendant's criminal conduct here, in which he escalated his troubling

9

involvement with penny stocks.  HWM's head trader (Ahn) and
compliance officer (Pagliarini) testified that they relied on
defendant's experience and expertise.  When they had questions about
a trade—they went to defendant.  Thus, contrary to the story
defendant told at trial (and repeats here) of someone who was removed
from trading operations at HWM and relied on the expertise of Homm
regarding penny stock investments and the alleged oversight of his
compliance officer (from whom he concealed key information including
the secret IM system), defendant had experience with penny stock
trading, was specifically aware of the risks involved in such
trading, had been sanctioned previously for a failure to follow those
rules, and intentionally disregarded those rules again and again to
benefit himself and ultimately cause significant harm to the Absolute
Funds and their investors.

### 2.   Assistance to Absolute Funds

Defendant's points to his assistance to the Absolute Funds in
the wake of Homm's departure as evidence of his purported good faith
(Def. Mem. at 6), but these actions are tainted by his self-interest.
At trial, Glenn Kennedy (General Counsel of the Absolute Funds)
testified that he viewed defendant's cooperation during this period
as a self-interested attempt for defendant to determine to what
extent his bad conduct was being uncovered and whether he was being
blamed for the losses that resulted from the Absolute Funds' penny
stock investments.  (Trial Tr., 30-33, July 2, 2019, attached hereto
as Ex. 9.)  While defendant's actions may have been at least somewhat
helpful to the Funds, they also benefited defendant.  In its
sentencing position, the government recognized defendant's behavior

1  as somewhat mitigating and accounted for that fact, among others, in

2  recommending a significant downward variance.

3         3.   Defendant's Lies and Attempts to Hide Behind Others

4         Defendant's lies detailed above in Section III(A) eviscerate his

5  claims of good faith.  Defendant claims that he "testified in good

6  faith to the best of his ability."  (Def. Mem. at 9.)  But this

7  statement is belied by the facts as established by the evidence and

8  testimony at trial.  Defendant lied at every step of the proceedings:

9  during routine audits of HWM, during the FINRA and SEC investigations

10 into the trading at HWM, under penalty of perjury in response to

11 questions posed by the SEC in writing, under oath in testimony before

12 the SEC, and under oath on the stand at trial.  Defendant repeatedly

13 has sought to minimize his role and to place the blame on others.

14 However, defendant's testimony about this role at HWM stood in stark

15 contrast to every other HWM witness at trial, which profoundly

16 undermines his credibility.  Moreover, defense counsel argued at

17 length at trial that defendant acted in "good faith" and relied on

18 the professionals he hired.  The jury considered and rejected these

19 arguments when it found defendant guilty of 18 felony counts.

20        More importantly, defendant's lies during the scheme and during

21 trial demonstrate that the government's recommended sentence of 96

22 months is needed for specific deterrence.  As discussed above,

23 defendant lied on the stand in an attempt to impeach the credibility

24 of government witnesses.  Rather than accept responsibility for his

25 crimes or testify truthfully in his own defense, defendant chose to

26 violate his oath and demonstrate his continuing contempt for the law.

27 Such conduct warrants the sentence recommended by the government.

28

1

2

      **C.**    **The Government's Recommended Sentence Would Not Result in Unwarranted Sentencing Disparities But Defendant's Recommended Probationary Sentence Would**

3       Section 3553(a)(6) requires the Court to minimize sentencing

4 disparities among similarly-situated defendants.  The government

5 already accounted for the need to avoid unwarranted sentencing

6 disparities in recommending a significant downward variance resulting

7 in 96 months' imprisonment.  The government has outlined in detail

8 defendant's role, both in its sentencing position and in Section

9 III(A).  The government addresses specific arguments defendant raised

10 in his sentencing memorandum as follows:

11        1.   <u>Florian Homm</u>

12       Homm is a fugitive from justice.  The government has vigorously

13 sought his arrest and will vigorously pursue his prosecution if he is

14 ever captured and within the United States' jurisdiction.  Certainly

15 the failures of a foreign nation (Italy) to secure defendant and the

16 lack of a treaty enabling Homm's extradition (from Germany) should

17 not be held against the government.  The fact that Homm so far has

18 succeeded in evading justice is not a mitigating fact in defendant's

19 favor.  Moreover, it should be noted that defendant assisted in

20 laundering money to Homm, which facilitated Homm in his evasion of

21 justice, at least incrementally.  The Swiss document defendant cites

22 is irrelevant and merely referred the case to the Swiss prosecutor

23 for further investigation.  (Reichert Decl. ¶ 15.)

24        2.   <u>Colin Heatherington</u>

25       The government agrees with defendant that Colin Heatherington is

26 a "central player" in the conspiracy.  (Def. Mem. at 15.)  Colin

27 Heatherington currently is awaiting extradition, and preliminarily

28 has been ordered extradited.  As with Homm, the government has

consistently sought to bring Colin Heatherington to justice and will
do so to do to the best of its ability.  That Heatherington's arrival
before this Court has been delayed is not attributable to the
government and certainly does not warrant mitigation for defendant.

        3.  Sean Ewing

Defendant makes an assortment of claims regarding Ewing's
possible knowledge of the scheme.  (Def. Mem. at 10-11.)  In his
deferred prosecution agreement, Ewing admitted that he caused ACMH's
failure to maintain books and records required under the Investment
Advisers Act in relation to the fraud scheme.  (See Docket No. 17
¶¶ 3-4, United States v. Sean Ewing, CR-16-317-JAK.)  There was scant
evidence at trial regarding Ewing's involvement in the scheme.
Indeed, the evidence pointed to a scheme between the co-conspirators
charged, even if Ewing should have had some awareness of problems
based upon the Parsi letter.  In any event, the disparity between the
disposition of Ewing's case and the recommended sentence for
defendant here is accounted for in the 15-level variance that the
government seeks, and certainly does not warrant a probationary term.

        4.  Craig Heatherington

Defendant claims that a probationary sentence is warranted
because Craig Heatherington received a deferred prosecution agreement
with the government.  As Craig Heatherington stated at trial, he was
a commercial diver who had no experience in finance or securities
trading when he was recruited by his brother to work in the back
office at the Absolute Funds.  Craig Heatherington's role in the
conspiracy was limited to doctoring internal spreadsheets and
covering up discrepancies when they arose after the illegal trades
were executed.  His personal profit from the scheme was minimal, as

13

1   was his awareness of the full scope of the scheme, unlike defendant.

2   Moreover, he accepted responsibility for his conduct, provided

3   documents to the government, and truthfully testified at trial.  As

4   such he is not similarly situated with defendant and any disparities

5   in their sentences already are accounted for in the government's

6   recommended sentence.

7          5.   Pagliarini and Ahn

8          Defendant argues that there are unwarranted sentencing

9   disparities because Pagliarini and Ahn were not charged.  (Def. Mem.

10  at 12-13.)  Once again, defendant tries to hide behind the employees

11  he placed in harm's way and who already both suffered greatly as a

12  result of his actions.  Put simply, Pagliarini and Ahn only knew what

13  defendant told them—and he did not want them to know the details of

14  his scheme, so he hid information from them both.

15         Ahn was a "glorified order taker" and, as defendant

16  acknowledges, made little, if any, profit from the scheme (he

17  received his standard salary and small bonuses as opposed to the tens

18  of millions defendant received).  (Ex. 5 at 96-97; Def. Mem. at 15.)

19  Defendant is the one who ordered Ahn to use the secret IM system.  He

20  is the person who told Ahn to hide the secret IM system from

21  Pagliarini and regulators.  And those secret IMs show that

22  defendant's approval was needed for all trades.  The HWM employees

23  all stated that defendant, not Ahn, controlled the trading desk and

24  approved all trades.  Ultimately, Ahn admitted his conduct, provided

25  the secret IMs to the government, and was sanctioned significantly

26  for his conduct and lost his trading license.

27         Elizabeth Pagliarini also is not similarly situated to the

28  defendant.  Pagliarini technically approved every trade at HWM, but

14

as was clear from trial, she was unaware of the secret IMs and never would have approved the trades had she known about them.  (Trial Tr., 43-45, June 27, 2019, attached hereto as Ex. 11.)  Defendant lied to Pagliarini about the secret IMs and told Tony Ahn to lie to her.  As soon as she found out, she quit HWM and self-reported to the SEC. The Court was present for her testimony and so is aware of the profound personal difficulties she was experiencing during the relevant period, which no doubt contributed to her missing some red flags.  Defendant also was aware of these facts and even said it was good not to have a compliance officer who was around all the time. Defendant should not be rewarded for taking advantage of Pagliarini's distracted state in the wake of her personal tragedies.  Moreover, there was no evidence whatsoever that Pagliarini received any personal benefit from the scheme—financial or otherwise (aside from receiving her standard salary and minimal bonuses during the same period).  In any case, she too received a significant sanction from the SEC as a result of her conduct.

### 6.   Sentences in Other Cases

The government's recommended sentence of 96 months' imprisonment takes into account sentences imposed in other criminal stock manipulation cases.  For example, the U.S. Sentencing Commission Report on Securities and Investment Fraud Offenses reported that in 2018 (fiscal year), the average sentence imposed for securities and investment fraud offenses was 54 months' incarceration, reflecting a downward variance from the average low-end Guidelines range of 77 months.  (See Report at 2, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Securities_Fraud_FY18.pdf.)  Notably, the

15

median loss amount in these cases was $2-3 million, significantly lower than the over $200 million in losses at issue in this case. Indeed courts in cases with losses more similar to the instant case have sentenced defendants even more harshly than the reasonable 96-month sentence the government has recommended here,[3] which accounts for the various mitigating and aggravating factors present in this case.  In sharp contrast, defendant's recommended sentence of probation is so disconnected from the guidelines and so dissimilar from similarly situated defendants that it would result unwarranted sentencing disparities.

### D.   General Deterrence

Defendant's request for a probationary sentence also ignores the goal of general deterrence.  This case represents one of many involving unscrupulous opportunists seeking to manipulate stock prices for their own advantage, which undermines the free-market.  As demonstrated by this case, prosecuting such conduct requires considerable government resources.  In order to obtain the evidence to prosecute this case, the investigation relied on assistance from FINRA, the SEC, and the FBI, as well as substantial international

---

[3] See, e.g., United States v. Georgiou, 777 F.3d 125, 132 (3d Cir. 2015) (defendant sentenced to 300 months' imprisonment for participation in a market manipulation scheme involving penny stocks that resulted in $55 million in actual losses); United States v. Schwamborn, 467 F. App'x 35, 36 (2d Cir. 2012) (defendant sentenced to 121 months' imprisonment for participation in stock manipulation scheme); see also United States v. Schwamborn, 542 F. App'x 87, 89 (2d Cir. 2013) ("[I]t was entirely foreseeable that the victims here would lose their investments because the stock in World Cyberlinks was inherently worthless"); S.E.C. v. Durante, 641 F. App'x 73, 76 (2d Cir. 2016) (defendant pleaded guilty to conspiracy to commit securities fraud and money laundering in connection with a stock manipulation scheme; defendant sentenced to 121 months' imprisonment).  The government's recommended sentence of 96 months' imprisonment accordingly does not present unwarranted sentencing disparities with similarly situated defendants.

16

1  assistance from law enforcement agencies in Switzerland, Canada, and
2  the Cook Islands, among other countries.  Investigators and forensic
3  accountants then had to comb through millions of lines of trading
4  data, analyze numerous bank accounts, and sift through millions of
5  pages of other discovery.  In light of the substantial challenges
6  inherent in investigating and prosecuting such illicit conduct, when
7  the government is able to successfully investigate these crimes,
8  significant sentences (like the 96-month sentence recommended here)
9  are necessary to ensure that others are dissuaded from attempting
10  similar crimes.

11  **IV.  LOSS CALCULATIONS**

12      Defendant's claim that loss and gain cannot be reliably
13  determined (Def. Mem. at 19-32) is undercut by the 555-page Appleby
14  Report, filed under seal, which was the result of the Absolute Funds
15  investigation into the Funds' losses resulting from the fraud.
16  Defendant does not address the report in a systematic or specific way
17  and instead makes vague claims that calculating losses in such cases
18  can be difficult.  While this is true, the government has submitted a
19  detailed report that reasonably estimates the actual losses here. [4]

20  _____

21      [4] The Court is permitted to rely on the report and need not
require live testimony.  In Williams v. New York, 337 U.S. 241
22  (1949), the Supreme Court held that courts may consider hearsay at
sentencing.  See also United States v. Berry, 258 F.3d 971, 976 (9th
23  Cir. 2001) (citing Williams); United States v. Littlesun, 444 F.3d
1196, 1199 (9th Cir. 2006) (holding that hearsay at sentencing must
24  merely "be accompanied by some minimal indicia of reliability").  The
Sentencing Guidelines follow suit by allowing a sentencing court to
25  consider information relevant to the sentencing determination
"without regard to its admissibility under the rules of evidence
26  applicable at trial, provided that the information has sufficient
indicia of reliability to support its probable accuracy."  U.S.S.G.
27  § 6A1.3(a).  The Ninth Circuit has affirmed the admissibility of
hearsay at sentencing so long as such materials are accompanied by
28  "some minimal indicia of reliability."  See United States v. Petty,

17

The Ninth Circuit has held that estimating losses does not require "absolute precision," and a district court may "make a reasonable estimate . . . based on the available information." United States v. Zolp, 479 F.3d 715, 719 (9th Cir. 2007).  It is "sufficient for the government to produce evidence . . . to allow the sentencing court reasonably to infer a pattern." United States v. Pham, 545 F.3d 712, 720 n.3 (9th Cir. 2008).  As to the calculation of losses relating to the value of securities, the guidelines specifically state that the reduction in the value of securities due to a defendant's conduct may be considered in the estimate of loss. U.S.S.G. § 2B1.1, comment. (n.3(C)(v)).  Of course, "[d]etermining the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses inevitably cannot be an exact science.  The guidelines' allowance of a 'reasonable estimate' of loss remains pertinent." United States v. Rutkoske, 506 F.3d 170, 179 (2d Cir. 2007) (emphasis added) (citation omitted).  Notably, "[i]n cases where," as here, "defendants promoted worthless stock in worthless companies, measuring the loss as the entire amount raised by the schemes is neither surprising nor complex, and is fully consistent with civil loss causation." United States v. Olis, 429 F.3d 540, 546 (5th Cir. 2005) (recognizing the difference between calculating losses in cases like United States v. Hedges, 175 F.3d 1312, 1314-15 n.6 (11th Cir. 1999), where the corporation's "stock became worthless when the conspiracy was discovered" and cases where the fraudulent transactions "cook the books" but do not render the underlying companies' stock "worthless").  The timing of the decline

---

982 F.2d 1365, 1369 (9th Cir. 1993).  Given the detailed description of the methodology used here, it satisfies more than the "minimal indicia of reliability," and the Court is permitted to rely on it.

1    in the penny stock share prices in this case is instructive, as the

2    shares declined sharply after the fraudulent scheme was discovered.

3    See Rutkoske, 506 F.3d at 179 (noting that in cases "where share

4    price drops so quickly and so extensively immediately upon disclosure

5    of a fraud[,] the difference between pre- and post-disclosure share

6    prices is a reasonable estimate of loss caused by the fraud").

7         Thus, the analysis here is not as complex (nor surprising) as

8    the cases defendant cites in his favor because defendant located the

9    penny stock companies in order to use them as tools in the portfolio

10   pumping scheme, and following the collapse of the scheme, the penny

11   stock companies were rendered worthless or nearly so, such that their

12   shares generally could not be redeemed.  The government's loss

13   calculations account for the purchase and sale of the penny stocks by

14   the Absolute Funds and the Hunter Fund and account for the "final

15   realized gain or loss on the [penny stocks] and Hunter Fund in the

16   currency in which the losses were incurred."  (See Appleby Report at

17   5.)

18        In sum, the Appleby Report provides a detailed financial

19   analysis that clearly describes the methodology used to calculate

20   loss amounts (see Appleby Report at 5-6) and provides the necessary

21   reasonable loss estimate that the guidelines require.  Thus, whether

22   the Court applies the preponderance or clear and convincing standard

23   for determining loss, the Report meets the government's burden of

24   providing reliable support for the loss and restitution amounts.

25   (See Appleby Report at 10 (chart summarizing actual loss).)

26   **V.   CONCLUSION**

27        For the foregoing reasons, the government respectfully requests

28   that this Court sentence defendant to 96 months' imprisonment, a

                                    19

five-year term of supervised release, restitution to the Absolute
Funds in the amount of $215,815,031, and a special assessment of
$1,800.